ATIYEH, GOVERNOR OF OREGON, ET AL. *v.* CAPPS
ET AL.

No. A-625.   Decided February 4, 1981

JUSTICE REHNQUIST, Circuit Justice.

This matter has previously come before me on the application of applicant Atiyeh, Governor of Oregon, applicant Watson, administrator of the Corrections Division of the State of Oregon, and applicant Cupp, Superintendent of the Oregon State Penitentiary, on a motion for a stay of the final injunction issued by the United States District Court for the District of Oregon pending appeal to the Court of Appeals for the Ninth Circuit.   I issued a temporary stay, feeling that on the basis of the application there was merit to some of the applicants' points, but not wanting to proceed further with even my own analysis without calling for a response. I called for that response, and it has now been received.

The tests have been stated and restated as to probability of success on the merits, the probability of four Justices voting to grant certiorari, and the like as guideposts for the exercise of the function of the Circuit Justice in granting or denying stays.   Because this is not an appeal from an adverse

ruling of the Court of Appeals for the Ninth Circuit, from which a similar stay was sought and denied, it is not in a posture where the so-called "stay equities" can be readily evaluated, but I am satisfied in my own mind that, although it should not be nearly as frequently done as in the case of a final judgment of the court of appeals, an application to a Circuit Justice of this Court from a district court is within the contemplation of the All Writs Act, 28 U. S. C. § 1651 (a). I do not understand the respondents to contest this proposition as a matter of law. I recognize that they are correct in their statement in their response that "[t]he normal presumption is that '[i]n all cases, the fact weighs heavily that the lower court refused to stay its order pending appeal.'" Memorandum for Respondents 2. And, because an appeal from the District Court order is presently pending before the Court of Appeals for the Ninth Circuit, the rule to be followed is that "[o]rdinarily a stay application to a Circuit Justice on a matter before a court of appeals is rarely granted . . . ." *Pasadena Board of Education* v. *Spangler*, 423 U. S. 1335, 1336 (1975) (REHNQUIST, J., in chambers).

Having given such time as was possible to the consideration of the lengthy and able submissions on the part of both parties, I have decided to grant the stay pending the decision of this Court in *Rhodes* v. *Chapman*, No. 80–332, presently scheduled for argument this Term, or the decision of the Court of Appeals for the Ninth Circuit pursuant to its expedited briefing schedule (whichever may come first). My reasons for doing so follow and they rest both on procedural and substantive grounds.

I find in the carefully considered opinion, findings of fact, and conclusions of law of the District Court a set of assumptions which I do not believe the Constitution warrants, and I believe that at least three other Justices of this Court would concur in my belief. The court dealt with a "maximum security prison" located in Salem, Ore., comprising 22 acres surrounded by a re-enforced concrete wall averaging

25 feet in height. Prisoners are housed in five units. One of these cellblocks was built in 1929, two in the early 1950's, and the newest in 1964. 495 F. Supp. 802, 808 (1980). The findings of fact and conclusions of law proceed to set forth in great detail the numbers, facilities, and conditions at this prison. Some of those findings and conclusions were based on the Standards of the American Correctional Association, *id.*, at 809, the National Sheriffs' Association Standards, *id.*, at 810, and the Standards of the United States Army. *Ibid.*

The District Court also relied on the testimony of a professor of psychology at the University of Texas at Arlington to the effect that the housing at the Salem institution is "inadequate to avoid adverse physical and mental effects." *Ibid.* It also relied on the testimony of the Dean of the University of Chicago Law School that the "overcrowding" levels that exist at the institution undermine the initiative of inmates to seek self-improvement and prevent their rehabilitation. *Id.*, at 811.

Naturally, penal officials would like to have a larger share of the State's budget, just as would any number of other state officials administering programs mandated by the State. But there is nothing in the Constitution that says that "rehabilitation" is the sole permissible goal of incarceration, and we have only recently stated that retribution is equally permissible. See *Gregg* v. *Georgia,* 428 U. S. 153, 184, n. 30 (1976).

The District Court concluded by stating that overcrowding "exceeds the level of applicable professional standards; has increased the health risks to which inmates are exposed; has impinged on the proper delivery of medical and mental health care; has reduced the opportunity for inmates to participate in rehabilitative programs; has resulted in idleness; has produced an atmosphere of tension and fear among inmates and staff; has reduced the ability of the institutions to protect the inmates from assaults; and is likely to produce embit-

tered citizens with heightened antisocial attitudes and behavior." 495 F. Supp., at 813.

I think the District Court, while it may be correct in its findings of fact, and is certainly closer to the scene than a single Circuit Justice in Washington, has missed the point of several of our cases, including *Price* v. *Johnston,* 334 U. S. 266 (1948), *Procunier* v. *Martinez,* 416 U. S. 396 (1974), and *Bell* v. *Wolfish,* 441 U. S. 520 (1979). It has chosen to rely on a plurality opinion in *Trop* v. *Dulles,* 356 U. S. 86 (1958), stating in dicta that the touchstone of the Eighth Amendment is "nothing less than the dignity of man." *Id.,* at 100.

I find the District Court's efforts to distinguish *Bell* v. *Wolfish, supra,* particularly unpersuasive, although I likewise realize that there is considerable difference of opinion among the Members of this Court as to the merits of that decision. The District Court states that *Bell* "is not controlling here" because double-celling of pretrial detainees for no more than 60 days is quite different from institutions housing people who have been convicted of crime and are sentenced to long-term confinement. But this cuts both ways: a pretrial detainee, presumably detained on probable cause but not yet having been found guilty as charged under our constitutional procedures, cannot be "punished" at all. See *Bell* v. *Wolfish, supra.* The respondents here, however, each of whom *has* been tried, found guilty, and sentenced to a term which turns out to be, in terms of "mean time served," 24 months, 495 F. Supp., at 814, are in a different boat from both their perspective and society's perspective. So far as they are concerned, they will have to endure the overcrowded conditions for a longer period of time than the pretrial detainees had to endure them in *Bell* v. *Wolfish, supra;* but from the point of view of society, the legislature has spoken through its penal statutes and its conferring of authority on the parole authorities to seriously penalize those duly convicted of crimes which it has defined as such. In short, nobody promised

them a rose garden; and I know of nothing in the Eighth Amendment which requires that they be housed in a manner most pleasing to them, or considered even by most knowledgeable penal authorities to be likely to avoid confrontations, psychological depression, and the like. They have been convicted of crime, and there is nothing in the Constitution which forbids their being penalized as a result of that conviction.

It is equally well settled that prisoners have constitutional rights, and that *cadena temporal,* see *Weems* v. *United States,* 217 U. S. 349, 382 (1910), and conditions such as those described in the Arkansas prison system in *Hutto* v. *Finney,* 437 U. S. 678 (1978), exceed the bounds permitted the States by the Eighth and Fourteenth Amendments to the United States Constitution. It is considerations such as these with which this Court must deal in its upcoming decision and opinion in *Rhodes* v. *Chapman, supra,* a case relied upon by the District Court in its findings and conclusions when it was simply a decision of the Court of Appeals for the Sixth Circuit. I think it best, in the exercise of my function as Circuit Justice, that the District Court have the benefit of this Court's opinion in that case before it takes over the management of the Oregon prison system.

The actual order entered by the District Court reads as follows:

> "[T]he court will require that a reduction of the total population at the three facilities by 500 persons be accomplished by December 31, 1980, together with a further reduction of at least 250 by March 31, 1981. The order will not direct the state to adopt any particular methods to achieve this goal. However, to assure that progress toward that goal is being made, defendants will be ordered to report monthly, commencing on September 1, 1980, on the number of persons housed at each

facility and the steps that have been taken and remain to be taken to meet the deadlines imposed." 495 F. Supp., at 806.

In my opinion, the above order of the District Court fails to comply with Federal Rule of Civil Procedure 65 (d), which provides in relevant part:

"Every order granting an injunction and every restraining order shall set forth the reasons for its issuance; shall be specific in terms; shall describe in reasonable detail, and not by reference to the complaint or other document, the act or acts sought to be restrained . . . ."

Several years ago we stated in *Schmidt* v. *Lessard,* 414 U. S. 473 (1974):

"As we have emphasized in the past, the specificity provisions of Rule 65 (d) are no mere technical requirements. The Rule was designed to prevent uncertainty and confusion on the part of those faced with injunctive orders, and to avoid the possible founding of a contempt citation on a decree too vague to be understood . . . .

"The requirement of specificity in injunction orders performs a second important function. Unless the trial court carefully frames its orders of injunctive relief, it is impossible for an appellate tribunal to know precisely what it is reviewing. *Gunn* [v. *University Committee to End the War,* 399 U. S.] 383, [388 (1970)]. We can hardly begin to assess the correctness of the judgment entered by the District Court here without knowing its precise bounds. In the absence of specific injunctive relief, informed and intelligent appellate review is greatly complicated, if not made impossible." *Id.,* at 476–477.

The language in the order of the District Court directing the prison officials to accomplish a further reduction of "at least 250" by March 31, 1981, falls short of this specificity requirement.

For all of the above-stated reasons, and because in the normal course of events by the close of this Court's October 1980 Term a decision should be handed down in *Rhodes* v. *Chapman, supra,* I think that the District Court's ultimate resolution of the case before it will be facilitated, not retarded, by the issuance of a stay as previously· indicated. There is no reason for courts to become the allies of prison officials in seeking to avoid unpleasant prison conditions when the executive and the legislature of the State have decided that only a certain amount of money shall be allocated to prison facilities; there is likewise no reason for the District Court to stay its hand when specific constitutional violations are called to its attention.

It is accordingly ordered that the injunction issued by the District Court be stayed, pending either the decision of the Court of Appeals for the Ninth Circuit in this case or the decision of this Court in *Rhodes* v. *Chapman, supra,* whichever may come first.