**UNITED STATES of America,
Appellee,**

v.

**Joseph DAZZO, Appellant.**

**No. 243, Docket 81–1268.**

United States Court of Appeals,
Second Circuit.

Argued Dec. 1, 1981.

Decided Feb. 22, 1982.

William J. Muller, Asst. U. S. Atty., E. D. New York, Brooklyn, N. Y. (Edward R. Korman, U. S. Atty., E. D. New York, Vivian Shevitz, Asst. U. S. Atty., Brooklyn, N. Y., of counsel), for appellee.

Roger Bennet Adler, New York City (Newman & Adler, Deborah A. Schwartz, New York City, of counsel), for appellant.

Before FEINBERG, Chief Judge, LUMBARD, Circuit Judge, and BARTELS, District Judge.*

FEINBERG, Chief Judge:

Defendant Joseph Dazzo appeals from a judgment of conviction in the United States District Court for the Eastern District of New York after a jury trial before Jack B. Weinstein, Chief Judge. Appellant was convicted of conspiracy to distribute a substantial quantity of marijuana in violation of 21 U.S.C. § 846, possession with intent to distribute of a substantial quantity of marijuana and methaqualone in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2, and importation of a substantial quantity of marijuana and methaqualone in violation of 21 U.S.C. §§ 952(a), 960 and 18 U.S.C. § 2. The judge sentenced appellant to a five-year prison term on each of these three counts, to be served consecutively, cumulative fines amounting to $45,000, and lifetime special parole. Appellant is incarcerated pending the outcome of this appeal.

I.

The evidence at trial established the existence of an extensive conspiracy to import large quantities of marijuana into New York from Colombia between November 1977 and November 1978. The marijuana was smuggled into the United States on a trawler, the "Terry's Dream," which was towed into port by the "Bill Mather," a tugboat. The testimony of Jesus Vega, a Coast Guard officer, and Robert De Grande, an individual recruited to serve on the "Terry's Dream" during its smuggling operations, indicated that this method was repeatedly used to bring marijuana into the United States. The operation came to an end, however, when both vessels were seized by the Coast Guard on the night of November 11–12, 1978.[1] A search of the vessels and vehicles revealed approximately 23 tons of marijuana and one-half million methaqualone tablets worth more than $15 million. No one was arrested at the time of the seizure because those involved had fled the premises shortly before.

Fifteen individuals, including appellant, were subsequently indicted for various narcotics violations. See *United States v. Saint Prix*, 672 F.2d 1077, 1079 (2d Cir. 1982). Before trial, however, appellant and Richard Mastrangelo were granted severances due to the unavailability of their counsel.

Appellant was linked to this conspiracy through evidence that he had purchased the "Bill Mather."[2] According to Frederick Ardolino, a commercial fisherman and boat surveyor in Brooklyn who testified under a compulsion order, appellant approached him about the purchase of a small tugboat in late 1977 or early 1978. Appellant bought the "Victory" from Ardolino, but it developed engine trouble and sank on the date of purchase.

Shortly after this abortive transaction, appellant again approached Ardolino about purchasing a tugboat for his friend, "John Ward." In fact, "John Ward" was really appellant's friend, John Bennett. "Ward" told Ardolino that he was interested in a small tugboat to tow oil barges, that he did not want to spend more than $65,000, and that he wanted the vessel as soon as possible. "Ward" also told Ardolino that he was

---

* Honorable John R. Bartels, Senior United States District Judge for the Eastern District of New York, sitting by designation.

1. Coast Guard officers also seized several trucks and vans, used to transport the narcotics from the marina, and a Buick sedan.

2. Another person, Edgar Taylor, was apparently responsible for purchase of the "Terry's Dream" at a cost of $177,000.

interested in buying some deep waterfront dockage in Long Island that was easily accessible from the ocean.

In January 1978, Ardolino, his cousin James Crispino, who was appellant's friend, "Ward," and two other individuals flew to Norfolk, Virginia to inspect the "Bill Mather." Appellant joined this group in Virginia, according to Ardolino. On January 30, 1978, the group of purchasers, including appellant, went to a shipyard in Norfolk to view the "Bill Mather." A shipyard representative, Alfred Jensen, identified appellant as a member of the group. The group told Jensen that it had a contract to haul garbage barges in New York and asked whether the "Bill Mather" could go 20 miles out to sea. After returning the next day for a test run, the group had the boat hauled out of the water to inspect the bottom and ultimately had steel plates installed to protect the bow area from ice. The cost of hauling the boat and installing the shields was approximately $2,000.

In early February 1978, the group, including appellant, purchased the "Bill Mather" for $59,000. Because the Norfolk shipyard would not accept cash, "Ward" obtained a cashier's check at a Norfolk bank. The check was only issued, however, after Ardolino offered his identification. "Ward" then signed the bill of sale on behalf of J & L Towing, the purchaser. Ardolino thereupon received between $600 and $750 in cash plus expenses for his services.

Later in February, the "Bill Mather" arrived in New York from Norfolk. Because of ice formations, the boat had to stay at Ardolino's dock for approximately one week before proceeding to Yancarib Marina, where the "Terry's Dream" was anchored. During this period, appellant came to Ardolino's dock to congratulate "Ward" on obtaining the tug.

Appellant was also linked to the conspiracy through his handling of repairs on the "Bill Mather." In April 1978, the "Bill Mather" arrived at Muller's boatyard in Brooklyn for repairs. "Ward" had previously contacted Ardolino about this repair work and stated that he was not concerned with price.

Appellant and two other men brought the "Bill Mather" to the boatyard. In dealing with boatyard employees, appellant used the names "John Ward" and "John Ward, Jr." Appellant also falsely stated to the yard foreman, Jim Muller, that the "Bill Mather" was under contract with New York City to tow garbage scows. During the two weeks in which repairs were performed, appellant came to the boatyard six to twelve times. At those times, appellant spoke with Muller about what work had been performed, what needed to be done, and what the repairs would cost. After completion of the initial repairs, appellant authorized several additional repairs on the vessel after receiving cost estimates from Muller. Appellant was identified not only by Jim Muller but also by another employee at the boatyard, Kathy Muller.

On April 25, 1978, the cost of these repairs was calculated as $12,954.54. Muller's boatyard received $13,000 in money orders worth $1,000 each and issued a refund check payable to cash for $45.15. Diane Dazzo, appellant's wife, endorsed and cashed this refund check.

Appellant did not testify and called only one witness, his wife. She testified that Glenn Hutchison, a defendant in *United States v. Saint Prix*, supra, had given her husband the boatyard's refund check in April 1978 and asked him to cash it. She asserted that her husband had then given the check to her, and she endorsed and cashed it.

Appellant's trial was marked by numerous disturbing events. On April 29, 1981, the government's only witness against Mastrangelo, appellant's co-defendant, was murdered by two gunmen in Brooklyn. As a consequence, the district court was forced to declare a mistrial with respect to Mastrangelo. Moreover, government witnesses were repeatedly approached and intimidated. One witness was informed at gunpoint that if he went into the grand jury and testified at trial, he and his family would be killed. The week before trial, Ardolino told Jim Muller that Kathy Muller, the only

known witness against appellant at the time, should give vague testimony at trial and that "they" would take care of her.

Appellant's trial ended on May 1, 1981 with a jury verdict of guilty. The judge sentenced appellant on June 5, 1981. In imposing sentence, the district court assumed that appellant neither knew that a witness was to be murdered nor approved of it. It found, however, that he was aware of the attempts to intimidate witnesses. The court also noted that appellant had not cooperated with the government. Under these circumstances, the court indicated that it did not view rehabilitation as a substantial factor and instead sentenced appellant for deterrent purposes.

## II.

In this court, appellant claims that the evidence at trial was legally insufficient to support a conviction; that he was denied a fair trial because the prejudicial effect of admitting evidence regarding his pre-conspiracy purchase of the "Victory" far outweighed its probative value; that the district court erred in admitting testimony on the "street value" of the seized drugs; that the government improperly obtained and utilized appellant's tax returns; and that appellant was denied due process because his sentence was based on consideration of improper criteria and the sentence was so excessive as to constitute cruel and unusual punishment.

■ Appellant's contention that there was insufficient evidence to warrant his conviction must be rejected. A considerable body of evidence, which stood essentially unrefuted, supported the jury's conclusion that appellant had been involved in the extensive conspiracy to import narcotics outlined above. Two witnesses, Ardolino and Jensen, testified that appellant was one of the purchasers of the "Bill Mather" in Norfolk. Kathy and Jim Muller, two employees at Muller's boatyard, identified appellant as the individual who, under an assumed name, oversaw repairs on the "Bill Mather" in April 1978. In addition, appellant's wife cashed a refund check from the

shipyard. Ardolino also testified that appellant had been involved in the purchase of another tugboat, the "Victory." Viewed in the light most favorable to the government and with all permissible inferences construed in the government's favor, *United States v. Ruffin*, 575 F.2d 346, 353–54 (2d Cir. 1978), this evidence was sufficient to support appellant's conviction.

■ Similarly, the trial court properly admitted evidence of appellant's purchase of the "Victory" under Fed.R.Evid. 403. Under that rule, a trial judge is vested with broad discretion in determining whether the probative value of evidence is outweighed by its prejudicial impact. Evidence of the purchase clearly had probative value. The transaction occurred within the period of time covered by the conspiracy, and as the prosecutor pointed out in an offer of proof made at side bar, the government contended that the "Victory" had been purchased for use in drug trafficking; therefore, when it sank, appellant promptly arranged the inspection and purchase of the "Bill Mather." As against this, it is not clear what prejudice appellant points to, except the logical inferences pressed by the government. This is not the "unfair prejudice" alluded to by the rule. Under the circumstances, the trial court's exercise of its broad discretion should not be disturbed. See *United States v. Williams*, 596 F.2d 44, 50 (2d Cir.), cert. denied, 442 U.S. 946, 99 S.Ct. 2893, 61 L.Ed.2d 317 (1979).

■ The trial court also properly admitted evidence of the value of the narcotics seized. Contrary to appellant's contention, the court specifically limited Special Agent John Huber's testimony to wholesale value, and no evidence of "street value" was admitted. Appellant did not object to this testimony and therefore waived this claim on appeal. *United States v. Knuckles*, 581 F.2d 305, 313 (2d Cir.), cert. denied, 439 U.S. 986, 99 S.Ct. 581, 58 L.Ed.2d 659 (1978). Assuming arguendo that the claim is properly before us, however, appellant's argument still fails. The value of the narcotics was relevant in discrediting the defense

theory that the evidence did not establish that appellant was a knowing member of the conspiracy. In light of the large amounts of money involved, the government argued that it was unlikely that the other conspirators would have allowed appellant to play such a critical role in the conspiracy unless he knew what was being planned and the need for secrecy. Under these circumstances, evidence of the wholesale value of the drugs was properly admissible. *United States v. Lasalandra*, 421 F.2d 1261, 1262–63 (2d Cir.) (per curiam), cert. denied, 398 U.S. 931, 90 S.Ct. 1830, 26 L.Ed.2d 97 (1970); *United States v. Glaziou*, 402 F.2d 8, 16 (2d Cir. 1968), cert. denied, 393 U.S. 1121, 89 S.Ct. 999, 22 L.Ed.2d 126 (1969).

■ Appellant also claims that we should reverse the conviction because the government improperly obtained and utilized his tax returns. The argument comes close to being frivolous. In obtaining the tax returns, the government scrupulously complied with the procedures and requirements of 26 U.S.C. § 6103(i)(1)(B), and the returns could properly be obtained through an ex parte application where, as here, they were relevant to the government's case. *United States v. Barnes*, 604 F.2d 121, 145–46 (2d Cir. 1979), cert. denied, 446 U.S. 907, 100 S.Ct. 1833, 64 L.Ed.2d 260 (1980). As in *Barnes*, appellant here had expended large sums of money, and his tax returns were admissible to show that his expenditures exceeded his reported earnings and were therefore probably derived from illicit activities. Id. at 146–47. Ultimately, however, only one document obtained under section 6103(i)(1)(B) was introduced into evidence, and it was offered only to provide an example of Diane Dazzo's signature. In fact, the government stated that it was willing to redact all but the signature line of the exhibit, but appellant's counsel requested that the jury be given the entire tax return. Moreover, appellant's counsel did not object to the introduction of this document at trial, and hence he cannot raise the claim on appeal. *United States v. Knuckles*, 581 F.2d at 313.

### III.

■ Finally, appellant argues that his sentence of 15 years in prison, $45,000 in fines and lifetime special parole denied him due process because it was based on improper criteria and was so excessive as to constitute cruel and unusual punishment. The scope of review of sentencing decisions is quite narrow. When the sentence imposed is within statutory limits, it is generally not subject to review unless the trial court relied on either material misinformation concerning the defendant or constitutionally impermissible factors. *United States v. Tucker*, 404 U.S. 443, 446–47, 92 S.Ct. 589, 591, 30 L.Ed.2d 592 (1972); *United States v. Mejias*, 552 F.2d 435, 447 (2d Cir.), cert. denied sub nom. *Padilla-Martinez v. United States*, 434 U.S. 847, 98 S.Ct. 154, 54 L.Ed.2d 115 (1977). Appellant has not demonstrated that the trial judge relied on erroneous information or constitutionally impermissible factors in imposing sentence.

■ Appellant's principal argument is that the trial judge sentenced him for deterrent purposes and did not view rehabilitation as a substantial factor. In particular, appellant contends that he received a harsh sentence because a key witness was murdered and three of four other witnesses were intimidated. Appellant argues that it was an abuse of discretion to sentence him more severely as an example to others when he was not responsible for the mistreatment of witnesses.

The judge could certainly assess the deterrent effect on others in imposing a sentence. *United States v. Snyder*, 668 F.2d 686, 691 (2d Cir. 1982). Deterrence was an especially appropriate objective here because not only were appellant's offenses extremely serious but, as the district court found, he also acquiesced in the intimidation of witnesses through his knowing silence and refusal to cooperate with the government in any way. Cf. *United States v. Hendrix*, 505 F.2d 1233 (2d Cir. 1974), cert. denied, 423 U.S. 897, 96 S.Ct. 199, 46 L.Ed.2d 130 (1975) (judge could exercise discretion to enhance sentence because he

believed defendant had perjured himself). As Chief Judge Weinstein pointed out, "[appellant was] being sentenced to deter others under these circumstances from joining gangs of importers of narcotics, and after the trial is commenced or prosecutions are commenced, from interfering with witnesses." As the judge added:

> This court will not tolerate interference with witnesses and murders of witnesses, and anyone involved in a case of this kind will be treated very harshly in order to deter others. Anybody participating in the trial has to understand that he's got to do everything to protect witnesses and not hurt them in any way, and the Bar has to understand that they've got to inform their clients of that.

It should also be noted that "[t]here is no constitutional principle that prefers rehabilitation over deterrence ... as a goal of sentencing." *Fielding v. LeFevre*, 548 F.2d 1102, 1108 (2d Cir. 1977) (footnote omitted); see also *Atiyeh v. Capps*, 449 U.S. 1312, 1314, 101 S.Ct. 829, 830, 66 L.Ed.2d 785 (1981) (Rehnquist, J.'s grant of application to stay final injunction) ("[T]here is nothing in the Constitution that says that 'rehabilitation' is the sole permissible goal of incarceration. . . ."). Hence, the trial court did not err in emphasizing deterrent purposes rather than rehabilitative ones.

■ Appellant also contends that his sentence was so excessive as to constitute cruel and unusual punishment in violation of the Eighth Amendment. This claim is also untenable. As the Supreme Court recently noted in *Rummel v. Estelle*, 445 U.S. 263, 272, 100 S.Ct. 1133, 1138, 68 L.Ed.2d 382 (1980), "[o]utside the context of capital punishment, successful challenges to the proportionality of particular sentences have been exceedingly rare." This case certainly does not qualify as one of those rare instances. Most importantly, the sentence

was within the statutorily prescribed maximum.[3] In light of appellant's involvement in a large-scale criminal organization that dealt in tons of drugs worth many millions of dollars and did not hesitate to use life-threatening force, the term imposed was not excessive. Moreover, appellant's sentence was comparable to those of other co-conspirators convicted of similar offenses. Appellant was one of the principal members of the conspiracy. He helped manage the substantial cash investment in the tugboat, and he supervised the repairs of the tug. In *United States v. Saint Prix*, supra, two other principals in the conspiracy, John Bennett and Glenn Hutchison, were sentenced to the maximum terms of imprisonment then authorized by law. Hutchison was convicted on one count and sentenced to the maximum of five years. Bennett was convicted on two counts and sentenced to the maximum of five years on each, to be served consecutively, and a special parole term of ten years. Here, appellant was convicted on three counts and received the maximum term, which amounted to 15 years plus lifetime special parole, just as other principals received the maximum terms for their offenses. Under these circumstances, the sentence clearly did not violate the Eighth Amendment's proscription against cruel and unusual punishment.

Because we find all of appellant's claims to be without merit, we affirm the judgment of the district court.

BARTELS, District Judge (concurring and dissenting):

I concur in the affirmance of the conviction. However, with all due respect, I must dissent to the process employed by the trial judge in imposing sentence.

The majority asserts that the trial judge "did not view rehabilitation as a substantial factor" but the trial judge went much fur-

---

**3.** As the judge pointed out during sentencing, appellant received the maximum sentence authorized by statute. It should be noted, however, that after appellant committed these offenses, Congress tripled the maximum penalty for wholesale marijuana smuggling. Pub.L.No. 96–359, 94 Stat. 1190, 1194 (codified as amend-

ed at 21 U.S.C.A. § 841(b)(6) (1981)). This indicates a congressional desire to deal harshly with drug offenders and reinforces our conclusion that the trial judge did not commit reversible error in imposing the statutorily-prescribed maximum.

ther and his remarks supplied the appellant with his principal argument for remand. Indeed, the trial judge in imposing sentence stated: "I think you will have an appeal on the basis of this sentence." The offense committed by Dazzo was particularly egregious, and the murder of a witness in his co-defendant's trial demonstrated the character and background of his associates. The trial judge was righteously indignant and outraged. Such reaction, however, does not eliminate the necessity to individualize the sentence or to consider the rehabilitation of the defendant in imposing sentence.

As a general proposition, the appellate court has no power to change or reduce a sentence which falls within the requisite legislative limits on the ground that the sentence is too severe, *Townsend v. Burke*, 334 U.S. 736, 68 S.Ct. 1252, 92 L.Ed. 1690 (1948), unless the trial court abused its discretion or failed to exercise any discretion at all. *Dorszynski v. United States*, 418 U.S. 424, 443, 94 S.Ct. 3042, 3052, 41 L.Ed.2d 855 (1974); *Yates v. United States*, 356 U.S. 363, 366–67, 78 S.Ct. 766, 768–69, 2 L.Ed.2d 837 (1958). The criteria which a court relies upon in imposing sentence are not insulated from appellate review. In *United States v. Hartford*, 489 F.2d 652, 654 (5th Cir. 1974), the court said:

> Appellate modification of a statutorily-authorized sentence ... is an entirely different matter than the careful scrutiny of the *judicial process* by which the particular punishment was determined. Rather than an unjustified incursion into the province of the sentencing judge, this latter responsibility is, on the contrary, a necessary incident of what has always been appropriate appellate review of criminal cases.

It is that process with which we are here concerned.

The criteria relied upon by Judge Weinstein appear from the following statements made at the sentencing:

> The gang murdered a witness during the course of the trial. [Dazzo] has to take the risk of joining a gang of murderers

and ... will be sentenced as member of a gang with international drug smugglers and murderers ...

[He will be sentenced] as a member of that gang in order to deter future defendants in this court from directly or indirectly interfering with our witnesses.

He also remarked:

> I'm sure he didn't understand that he was getting involved with murder when he became a member of the gang. But, nevertheless, that's the risk you take when you become involved in a crime ... I am assuming that this defendant did not know that the man was going to be murdered, did not approve of it, and would not have approved of it if he had been consulted. I don't think he wasn't aware of the fact that other witnesses were being threatened.

Finally he stated:

> Don't talk about rehabilitation, because I have no intention of rehabilitating him. I'm not going to sentence him for rehabilitation purposes. He's going to be sentenced for deterrence, solely.

It is apparent that one of the reasons for the sentence was that a witness against a co-defendant was murdered after the conspiracy, although Dazzo had no knowledge that the witness was about to be murdered, did not approve of it and would not have approved of it had he been consulted. In fact, the judge denied that Dazzo was in any way guilty of the murder, although he associated Dazzo with that guilt as a member of the gang which ultimately murdered the witness. Obviously, one of the elements of this sentence was retaliation predicated upon the outrage that a proposed witness at the trial was murdered. The judge hoped to "deter future defendants in this court from directly or indirectly interfering with our witnesses."

As was aptly stated in *United States v. Wardlaw*, 576 F.2d 932, 939 (1st Cir. 1978):

> [W]hile sentencing judges have considerable discretion in sentencing, they may not relentlessly pursue at a defendant's cost a single, questionable theory while simply brushing aside all the other criteria com-

monly weighed by the vast majority of sentencing courts. Defendants were entitled to have their sentences set primarily in terms of the seriousness of their own crimes and associated individual factors. They were not to be viewed chiefly as instruments of retaliation against other different criminals. The sentences must accordingly be vacated and the cases remanded for resentencing of both defendants.

*See also United States v. Grayson*, 438 U.S. 41, 98 S.Ct. 2610, 57 L.Ed.2d 582 (1978); *Roberts v. United States*, 449 U.S. 821, 101 S.Ct. 79, 66 L.Ed.2d 23 (1980). Dazzo was sentenced also because of his membership in "a gang of murderers."

Another disturbing element in the sentencing process appeared when the judge stated that he would not sentence Dazzo for any rehabilitation purposes. Rehabilitation is a factor to be considered by every district judge in imposing sentence and cannot be brushed aside solely for deterrence. Mr. Chief Justice Burger in *United States v. Grayson, supra*, 438 U.S. at 46, 98 S.Ct. at 2613, explained:

> Approximately a century ago, a reform movement asserting that the purpose of incarceration, and therefore the guiding consideration in sentencing, should be the rehabilitation of the offender, dramatically altered the approach to sentencing. A fundamental proposal of this movement was a flexible sentencing system permitting judges and correctional personnel, particularly the latter, to set the release date of prisoners according to informed judgments concerning their potential for, or actual, rehabilitation and their likely recidivism. (Footnote omitted.)

Accordingly, as early as 1949, Mr. Justice Black in *Williams v. New York*, 337 U.S. 241, 247, 69 S.Ct. 1079, 1083, 93 L.Ed. 1337 (1949), stated that the

> prevalent modern philosophy of penology [is] that the punishment should fit the offender and not merely the crime....

and that sentences should be determined with an eye toward the "[r]eformation and rehabilitation of offenders". *Id.*, at 248, 69

S.Ct. at 1083. *See also United States v. Cavazos*, 530 F.2d 4 (5th Cir. 1976).

Dazzo was sentenced to three consecutive five-year terms, a $45,000 fine, and a lifetime special parole. He was only 26 years old, a high school dropout, without a criminal record, and with a wife and child. It is impossible for one to say that he cannot be rehabilitated if he so desires. It is true that there is no constitutional principle that prefers rehabilitation over deterrence, but it is also true that there is no constitutional principle that prefers deterrence over rehabilitation. There is no inconsistency between the two and both must be weighed before imposing sentence.

Since I believe the trial judge did not consider the proper criteria in imposing sentence, it is my conclusion that the sentence should be vacated and the case remanded for resentencing.