**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Jules SAINT PRIX, Glenn H. Hutchison, John Bennett, James T. Blakley and James R. Blakley, Defendants-Appellants.**

**Nos. 492–496, Dockets 81–1214 to 81–1218.**

United States Court of Appeals, Second Circuit.

Argued Dec. 1, 1981.

Decided Feb. 22, 1982.

Certiorari Denied May 24, 1982. See 102 S.Ct. 2274.

John L. Pollok, New York City (Hoffman Pollok & Gasthalter, Ronald Rubenstein, New York City, of counsel), for defendant-appellant James R. Blakley.

Joel B. Rudin, New York City, for defendant-appellant James T. Blakley.

Maurice M. McDermott, New York City, for defendant-appellant John Bennett.

Edward M. Chikofsky, New York City, for defendant-appellant Jules Saint Prix.

Anne C. Feigus (Ronald P. Fischetti, New York City, of counsel), for defendant-appellant Glenn H. Hutchison.

Susan E. Shepard, Asst. U. S. Atty., Brooklyn, N. Y. (Edward R. Korman, U. S. Atty., E. D. N. Y., Vivian Shevitz, Asst. U. S. Atty., Brooklyn, N. Y., of counsel), for plaintiff-appellee.

Before FEINBERG, Chief Judge, LUMBARD, Circuit Judge, and BARTELS, District Judge.*

LUMBARD, Circuit Judge:

On the night of November 11–12, 1978, the United States Coast Guard and other law enforcement agencies seized 23.4 tons of marijuana and 499,000 pills of methaqualone found in vehicles and aboard a fishing boat at the Yancarib Marina on Jamaica Bay, Queens, New York. Subsequent investigation discovered that the seizure had terminated a massive conspiracy to import drugs, beginning with the purchase of the shrimp boat TERRY'S DREAM in November 1977 and continuing through three trips between Colombia and New York. Fifteen people were indicted in the Eastern District of New York on various counts of possession and conspiracy; ten were tried[1] and five were found guilty after a six-week jury trial before Judge Bramwell (E.D.N.Y.). They appeal. Jules Saint Prix, lessee and operator of the Yancarib Marina, argues that seizure of the drugs violated his fourth amendment rights. James R. Blakley, his son James T. Blakley, John Bennett and Glenn H. Hutchison challenge various trial rulings.[2] We affirm.

---

* Honorable John R. Bartels, United States District Judge for the Eastern District of New York, sitting by designation.

1. Of the other five named in the indictment, three are fugitives from justice. Judge Bramwell severed the trial of the remaining two, Joseph Dazzo and Richard Mastrangelo, because their counsel was unavailable. The case against Mastrangelo was severed and a mistrial declared when the government's key witness was shot dead on the day he was to testify at trial. Dazzo was convicted after a jury trial before Judge Weinstein on counts of conspiracy and possession. Oral argument in Dazzo's appeal was heard at the same time as the argument in this case, and the decision is reported at 672 F.2d 284 (1982).

2. All appellants were convicted of one count of conspiring between November 10, 1977 and November 11, 1978, to possess and import marijuana in violation of 21 U.S.C. § 846 (1976). James R. Blakley and his son, James T. Blakley, were also convicted of one count of importing marijuana into the United States in August, 1978, in violation of 21 U.S.C. § 952(a) and 18 U.S.C. § 2 (1976); Jules Saint Prix and John Bennett were also convicted of one count of importing marijuana and methaqualone tablets into the United States in November 1978 in violation of 21 U.S.C. §§ 952(a), 960, and 18 U.S.C. § 2 (1976).

Bennett was given the maximum sentence of five years imprisonment on each count, plus a special parole term of 10 years. The Blakleys were sentenced to five years on each count, the sentences to run concurrently, but Blakley senior was to serve only six months in jail followed by a parole term of 10 years on account of his poor health. Saint Prix was sentenced to five years for conspiracy and five years for the substantive offense, plus a 2-year special pa-

A caller identifying himself only as "George" phoned the Coast Guard station at Governors Island from a New York City tavern at 9:50 p. m. on November 11, 1978.[3] He said a tug and a shrimp boat were expected at the Yancarib Marina in Queens, and that men with vans and trucks were waiting to unload the boats. He said none of the vans and trucks had any ice—indicating that they were expecting to unload not fish, which must be refrigerated, but a somewhat hotter cargo of narcotics. It took an hour and a half for this information to reach Lieutenant David Van Patten, acting group operations officer at the Coast Guard station at Rockaway, who had jurisdiction over Queens. Called at home at 11:20 p. m., Van Patten reached the Rockaway station by 11:35. "George" was at the station; he told Van Patten that about 25 men were unloading bales of marijuana at the marina. Van Patten told the duty officer to order land based police to the marina, and left for the marina aboard an unlit 41-foot utility boat.

The Yancarib Marina comprises about two acres of woods and marsh, a clearing which contains a few buildings, and piers extending into the Somerville Basin of Jamaica Bay. The marina fronts on two city streets with row houses across one street and a vacant lot across the other; on the third side is a junk yard and on the fourth side is Somerville Basin. A cyclone fence demarcates the land borders of the marina. Detective Miller Edwards and his partner from the United States Park Police arrived at the marina first. They climbed over the fence, and with guns drawn felt their way along the bulkhead at the marina's shoreline. They found nobody. They watched the Coast Guard cutter swing alongside a 50-foot tugboat which was lashed to a 75-foot shrimp boat.

Lieutenant Van Patten found the tugboat and the shrimper as described by the informer. He and his crew boarded the tugboat, which was called the BILL MATHER. They then climbed onto the shrimper TERRY'S DREAM. Van Patten smelled marijuana in the afterhold—a cargo compartment in the back of the boat—but the hold was empty. He entered the pilot house, saw sophisticated navigational equipment not usually found on such fishing boats, and touched a cup of coffee which was still hot. The forward hold underneath the pilot house was nearly filled with 152 60-pound burlap-wrapped bales of marijuana, each measuring approximately 3 by 2 by 2 feet. Some of the bales were labeled "Product of Colombia." The hold also contained cartons of methaqualone pills worth about $1.5 million wholesale.

At some point after the Coast Guard boarded the shrimp boat, Detective Edwards and his partner identified themselves and joined Van Patten aboard the TERRY'S DREAM. Van Patten radioed ground units to move into the marina and he disembarked to begin a search. The Park Police, New York City police, customs officials and agents of the Drug Enforcement Administration participated in the search. No people were found, but the searchers discovered three vans and four 18–20 foot trucks. Two vans were filled with bales of marijuana; one was littered with marijuana scraps. Two trucks were filled with bales; one was partially full. In all, 291 bales were seized from boat and vehicles worth about $15 million wholesale. The police searched the marina office and found mayonnaise, cold cuts, partly made sandwiches, beer and warm coffee—evidence of a recently interrupted meal.

role term—the sentence for the substantive offenses to run concurrently with the prison term for conspiracy. Glenn H. Hutchison was given the maximum sentence of five years imprisonment.

**3.** The informer's call to Governors Island was recorded on a machine with a 30-day loop of tape. The Coast Guard transcribed the call, but neglected to preserve the recording, which was automatically recorded over and erased 30 days later. The informer was never identified. Defendants objected to any use of the transcript, which was admitted in the suppression hearing but not at trial. Our analysis of the suppression hearing in no way depends on information supplied by the informant.

The marina was leased and operated by defendant Jules Saint Prix. The day of the seizure Saint Prix had ordered his employees to build a plywood wall in one of the vans in which marijuana was found to separate the drivers of those vans from loose cargo carried back. Also on the day of the seizure, Saint Prix told his employees to adjust small docks attached to marina piers in order to accommodate the BILL MATHER and TERRY'S DREAM. Both boats had previously docked at the Yancarib Marina. Prior to 1978, Saint Prix was thousands of dollars in arrears on the marina lease, but in 1978, the period of the alleged conspiracy, he paid his $16,600 rent and at least $6,000 more.[4]

The history of the TERRY'S DREAM and the BILL MATHER linked the Blakleys to the conspiracy. Records kept by New York City Transit Authority employees at a toll bridge linking Queens with the end of the Rockaway Peninsula show that BILL MATHER and the TERRY'S DREAM left the Rockaways for the Atlantic Ocean in February, August and October of 1978. The February trip was interrupted by the Coast Guard. Petty Officer Jesus Vega boarded the shrimper and smelled marijuana. The commanding officer of Vega's ship, however, decided against searching the boat.[5]

Before the August trip, the conspirators repaired the TERRY'S DREAM at the Lantana boatyard, Lantana, Florida, and worked on the BILL MATHER at the Muller boatyard in Brooklyn. James R. Blakley signed work forms at Lantana. Robert DeGrande, the government's prime witness,[6] testified that he worked with the Blakleys on the TERRY'S DREAM at Lantana, and that he, the Blakleys and others took the TERRY'S DREAM to Colombia, picked up a load of marijuana and returned to New York.

The October trip was preceded by further repairs on the TERRY'S DREAM in September 1978 at the Rivara boatyard in Queens. Maureen Marshall, who worked behind Rivara's lunch counter, identified James R. Blakley. Frederick Ardolino, a tug boat inspector,[7] did not identify the Blakleys but did testify to a "feeling" that the people working on the TERRY'S DREAM were father and son. Records at the International Hotel, Kennedy Airport, for October 1978 bore the name "Blakley." The TERRY'S DREAM left Rivara's on October 6, and proceeded to Key West, Florida. James R. Blakley had a room at the Key West Holiday Inn from October 15 to 18; he and his son James T. Blakley signed room service bills at the Inn. The TERRY'S DREAM returned to New York on November 11 to be seized by the Coast Guard.

One of the cars parked at the marina on the night of the seizure was a 1974 Buick registered to the defendant John Bennett. The keys to Bennett's car were found on a desk in the marina office, amidst the abandoned sandwiches and drinks. Ardolino testified that Bennett purchased the BILL MATHER in January 1978 at the Loveland boatyard in Norfolk, Virginia for $59,000[8] cash on behalf of the "J&L Towing Co." of

---

4. Joseph Falco, president of Falco Construction Corp. which owned the Yancarib Marina, gave two different figures for Saint Prix's payments in 1978: $22,500 and $26,500.

5. The reason Petty Officer Vega was ordered not to search the boat does not appear in the record.

6. DeGrande offered his story about the August 1978 trip to the U.S. Attorney after he had been arrested in Michigan on charges of selling cocaine. The Michigan court was notified that DeGrande was cooperating with the U.S. Attorney. DeGrande was convicted and sentenced to lifetime parole.

7. Ardolino became a witness under the compulsion of an order to testify pursuant to which he was granted immunity.

8. Bennett under the name "John Ward" offered the Loveland $59,000 cash. The company asked for a check instead. Bennett proceeded to buy a cashiers check for that amount from a local bank. When the bank asked for identification, Bennett said he had none with him. Ardolino, who accompanied Bennett to Virginia to advise him on tugboats, offered his identification, which the bank accepted.

302 London Road, Staten Island, New York. The company was fictitious but the address was real. It was a house owned by Bernard D'Aquila, who rented the house in 1977–78.[9] D'Aquila testified that a man identifying himself as "John Bennett" answered the phone at 302 London Road; the man said that he lived there from time to time. Someone using the name "Bennett" paid the Robin Ford dealership on Staten Island $8,000 cash towards the purchase of two of the vans in which marijuana was found. Bennett also purchased a Harley-Davidson motorcycle for $4,000 cash in 1978. Bennett filed no tax return for 1978; the source of cash that paid for the boat and motorcycle was unexplained.

In the glove compartment of Bennett's Buick was a temporary New York State insurance identification card for the defendant Glenn Hutchison. D'Aquila identified Glenn Hutchison as someone living at 302 London Road. Someone using the name Glenn Hutchison showed up at Robin Ford to purchase one of the marijuana vans. When the BILL MATHER was repaired at the Muller boatyard in April 1978, the repairs were paid for with money orders bought from Security Federal Savings & Loan, Staten Island. The hand printing on the money orders was identified as Glenn Hutchison's handwriting. Hutchison spent almost $22,000 on a BMW and a Harley-Davidson motorcycle in 1978. He, too, failed to file a tax return, and the income supporting those purchases remained unexplained.

The legality of the search on November 11–12 is the central issue on appeal. Saint Prix argues that the evidence should have been suppressed because the search was made without a warrant in violation of his fourth amendment rights. At the pre-trial suppression hearing, Judge Bramwell ruled that the Coast Guard's warrantless search of the TERRY'S DREAM and the BILL MATHER was authorized by 14 U.S.C. § 89 (1976), and therefore not subject to the usual warrant requirements. Judge Bramwell found that the Coast Guard faced exigent circumstances as the search of the boat indicated that the crew had just left. This, coupled with the Coast Guard's authority to search for contraband under 19 U.S.C. § 482 (1976), justified their search of the marina under the fourth amendment. He denied defendant's motion to suppress. We affirm for reasons which differ from those of the district court.

■■■ The Coast Guard's search of the TERRY'S DREAM cannot be challenged by Saint Prix because he had no "legitimate expectation of privacy" in the vessel. Only a defendant whose own privacy has been invaded can exclude evidence taken during the invasion. *Rakas v. Illinois*, 439 U.S. 128, 134, 99 S.Ct. 421, 425, 58 L.Ed.2d 387 (1978). Saint Prix merely rented dock space to the TERRY'S DREAM. The Coast Guard touched nothing of Saint Prix's, invaded no area under his control and infringed no property right of his by boarding the TERRY'S DREAM. The search violated no right of his, and he cannot exclude its fruits. *Rawlings v. Kentucky*, 448 U.S. 98, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980).

■■■ On boarding the vessel, the Coast Guard found large quantities of marijuana and indications that more had recently been unloaded.[10] They found sophisticated elec-

---

**9.** D'Aquila rented his house to Charles Dazzo, the father of Joseph Dazzo, the conspirator who was tried and convicted in a separate trial.

**10.** We do not believe the Coast Guard faced "exigent circumstances" justifying the search of the marina. The transcript of the suppression hearing—which no counsel saw fit to include in the appendix or even in the original record—discloses that Detective Edwards and his partner penetrated the marina and traversed its shoreline without seeing anyone well before the Coast Guard boarded the TERRY'S

DREAM. These facts hardly paint a picture of exigent circumstances in view of the numerous other law enforcement officers then present.

Edwards' trespass, however, does not give Saint Prix grounds to suppress evidence. Edwards discovered nothing during his trespass, and he gave Van Patten no information contributing to the success of the later search. A fourth amendment violation which produced no evidence and led to none gives Saint Prix no grounds to protest the subsequent and independent search of the vehicles on his property. *See United States v. Allen*, 633 F.2d 1282, 1291

tronic navigational equipment which was not common to such fishing boats. They had reasonable certainty that the TERRY'S DREAM—an ocean going shrimp boat—had carried marijuana to the Rockaways from somewhere beyond the ocean border of the United States. They had, in short, reasonable certainty that the TERRY'S DREAM had crossed the border. When Lieutenant Van Patten ordered the marina searched, he was searching for contraband which he was reasonably certain had just entered the United States from the high seas. We think the search of the vans and trucks at the marina was a "border search" and thus reasonable under the fourth amendment.

■ Searches without a warrant and even without probable cause do not violate the fourth amendment if they are "searches made at the border, pursuant to the long-standing right of the sovereign to protect itself by stopping and examining persons or property crossing into this country." *United States v. Ramsey*, 431 U.S. 606, 616, 97 S.Ct. 1972, 1978, 52 L.Ed.2d 617 (1977). *See* Note, *High on the Seas: Drug Smuggling, the Fourth Amendment and Warrantless Searches at Sea*, 93 Harv.L.Rev. 725, 731–38 (1980). The "border" is an elastic concept; its precise limits depend on the facts of each case. *United States v. Ajlouny*, 629 F.2d 830, 834 (2d Cir. 1980), *cert. denied*, 449 U.S. 1111, 101 S.Ct. 920, 66 L.Ed.2d 840 (1981). We have held that the "border area" includes public streets adjacent to New York City's docks, so that customs officials may conduct border searches in that area. *United States v. Glaziou*, 402 F.2d 8, 12–13 (2d

Cir. 1968), *cert. denied*, 393 U.S. 1121, 89 S.Ct. 999, 22 L.Ed.2d 126 (1969). The Fifth Circuit has upheld the "border search" of a truck after it had traveled two miles from a marina. *United States v. Hill*, 430 F.2d 129 (5th Cir. 1970). Here the trucks were searched while they were still in the marina.[11] *See also United States v. Tilton*, 534 F.2d 1363 (9th Cir. 1976) (boat on trailer, parked at lot outside marina, was subject to border search); *United States v. Beck*, 483 F.2d 203, 208 (3d Cir. 1973) (watchmen's car stopped half mile from pier and subjected to border search), *cert. denied*, 414 U.S. 1132, 94 S.Ct. 873, 38 L.Ed.2d 757 (1974); *United States v. McGlone*, 394 F.2d 75 (4th Cir. 1968) (car stopped in parking lot adjacent to harbor and subjected to border search).

■ The other arguments raised by appellants are without merit. Hutchison contends the Robin Ford sales slips bearing his name should not have been submitted to the jury because they were hearsay. But the sales slips were not admitted to prove that Hutchison bought the vans. They were admitted to prove that someone using Hutchison's name bought the vans, from which the jury could infer that the person using Hutchison's name was Hutchison himself. Admission for this purpose is permissible so long as other evidence connected Hutchison with the person using his name. *United States v. Lieberman*, 637 F.2d 95, 101 (2d Cir. 1980). Such evidence is in the record. Hutchison lived at 302 London Road, the address at which Bennett registered the

---

(9th Cir. 1980), *cert. denied*, —— U.S. ——, 102 S.Ct. 133, 70 L.Ed.2d 112 (1981).

The "border search" exception does not justify searches of homes or business establishments such as the offices of the Yancarib Marina. *United States v. Ramsey*, 431 U.S. 606, 616, 97 S.Ct. 1972, 1978, 52 L.Ed.2d 617 (1977). But the evidence from the marina office was not used against Saint Prix in any explicit fashion, nor did it lead to other evidence used against him. Its effect on Saint Prix's trial was negligible; therefore, admission of evidence from the marina office was harmless error as far as Saint Prix was concerned. The fact that the keys to Bennett's car were found in the marina office amidst the abandoned dinner was

used against Bennett by the government, but Bennett has no legitimate expectation of privacy in Saint Prix's office, and cannot exclude the fruits of its search.

**11.** The fact the truck in *Hill* was mobile, and the ones here were parked, is of no moment. The authority to conduct a "border search" under the fourth amendment does not depend on exigent circumstances. The Fourth Circuit upheld as reasonable under the fourth amendment the warrantless search of an imported camper which had been under the control of customs for days and was then in a customs warehouse. *United States v. Gallagher*, 557 F.2d 1041 (4th Cir. 1977).

BILL MATHER and at which Bennett lived. Bennett provided the cash for the vans bought at Robin Ford.

 The Blakleys raise various objections to Judge Bramwell's rulings on evidence. James T. Blakley argues Ardolino should not have been allowed to testify that he, Ardolino, believed workers on TERRY'S DREAM included a father-son team. This was no more than Ardolino's opinion from facts he had observed, and thus admissible. Fed.R.Ev. 701. James R. Blakley contests Maureen Marshall's identification of him as a worker on the TERRY'S DREAM, on the grounds that suggestive photo arrays were shown to Ms. Marshall when she testified before the grand jury. Three times Ms. Marshall picked out a photo from arrays before the grand jury. She picked out James R. Blakley from the two arrays that contained his photo; she picked out another person from a third array which did not include James R. Blakley's photo. James R. Blakley argues that Judge Bramwell prevented effective cross examination of Ms. Marshall on her prior inconsistent identification. The record does not support these claims. Cross examination of Ms. Marshall was thorough. She was repeatedly questioned about her prior inconsistent identification. The photo arrays appear to have been properly constructed. Ms. Marshall viewed James R. Blakley every day for a period of weeks. Permitting her to identify James R. Blakley in court was not error.

 The Blakleys protest that records from the International Hotel at Kennedy Airport should not have been admitted because the identification of the Blakleys as hotel guests was hearsay. But the government provided substantial evidence corroborating the hotel records, as required by *Lieberman, supra.* Maureen Marshall testified that the Blakleys told her they were staying at the International Hotel. Phone records showed calls made from the hotel to the Blakley home in Fort Myers, Florida. It was not error to admit the hotel records.

 Bennett contends that D'Aquila should not have been allowed to testify that a man calling himself Bennett answered the phone at 302 London Road. Bennett failed to raise this objection at trial; at any rate, D'Aquila's testimony would be admissible under *Lieberman* to show that someone answered and gave Bennett's name. That is how the prosecution used D'Aquila's testimony in summation. Bennett also argues that the government should not have been allowed to show that he failed to file any tax returns for 1978 where the government's only evidence of Bennett's sudden accession to wealth was the purchase of a $4,000 motorcycle. Bennett argues that a $4,000 purchase does not show great wealth in these inflationary times. But this misses the point of the evidence. Bennett made this purchase in cash. He also laid out $59,000 cash for the BILL MATHER. In a narcotics prosecution, it is well established that the government may introduce evidence of cash purchases coupled with tax evidence tending to show that a defendant had no legitimate source of cash. *United States v. Viserto,* 596 F.2d 531, 536 (2d Cir. 1979). The tax evidence may include the failure to file tax returns. *United States v. Hinton,* 543 F.2d 1002 (2d Cir.), *cert. denied,* 430 U.S. 982, 97 S.Ct. 1677, 52 L.Ed.2d 376 (1977). Given Bennett's use of $63,000 cash in 1978, we do not think Judge Bramwell erred in permitting the government to show that Bennett filed no tax returns in 1978.

We have considered the other arguments by the appellants, and we conclude that they do not merit discussion.

Affirmed.