Allen Lyn TAYLOR, et al., Plaintiffs,

v.

Charles WOLFF, et al., Defendants.

Civ. No. 79–162–JMB.

United States District Court,
D. Nevada.

Sept. 17, 1994.

Frankie Sue Del Papa, Atty. Gen., Cameron J. Parks, Deputy Atty. Gen., Litigation Div., Carson City, NV, for defendants.

Ernest K. Nielson, Washoe Legal Services, Reno, NV, for plaintiffs.

## OPINION AND ORDER

JAMES M. BURNS, Senior District Judge, Sitting by Designation.

According to a venerable slang expression, "Close only counts in horseshoes and hand grenades." But we ought not overlook an even more venerable expression from the great Holmes that holds that "General propositions do not decide concrete cases."[1] The concrete issue I must decide in this venerable case is whether "almost 100%"[2] is equivalent to full compliance.

## BACKGROUND

Plaintiff brought this case in 1979 challenging prison conditions in the Nevada Department of Prisons (NDOP). The case developed into a class action on behalf of all present and future inmates. Specifically, the action challenged the provision of mental health care to inmates.

The parties entered into a stipulated settlement agreement in 1983 which was amended on April 20, 1984 (Stipulated Agreement). The Stipulated Agreement led to an order approving compromise of the class action in 1984. I issued a Final Order on May 20, 1988, in which I found that defendants had fully complied with all but two of the provisions of the Stipulated Agreement. With respect to the remaining provisions, Paragraphs IV and VIII of the Stipulated Agreement, I directed defendants to implement the Mental Health Plan co-written by Dr. William S. Logan and Mary Alice Conroy. I

also appointed Dr. Logan to monitor implementation of the Mental Health Plan and compliance with the Stipulated Agreement and the Final Order.

Between 1988 and the present, Dr. Logan performed periodic monitoring visits to the NDOP facilities and generated seven written Progress Reports on compliance. He also regularly attended status conferences in which he supplemented his written reports with oral presentations to the court. I adopt the conclusions expressed in the Progress Reports and in his oral presentations as my own findings of fact.

Dr. Logan issued the seventh Progress Report in mid July 1993. In preparation for his seventh Progress Report, he conducted three site visits to various areas of the NDOP mental health system accompanied by the plaintiffs' expert, Dr. Jeffrey L. Metzner. Dr. Logan identified seven items that defendants needed to complete to reach full compliance, in his view.

At the hearing on July 21, 1993, defendants moved for a declaration of compliance. Plaintiffs opposed based on the seven shortcomings identified in Dr. Logan's seventh Progress Report. At my request, Dr. Logan was able to return to the NDOP facilities in August to reassess the seven items he had identified. He then gave an oral report of his conclusions at the hearing on August 27, 1993.

## DISCUSSION

There is no doubt that the defendants have made tremendous progress in every aspect of their mental health care delivery system. The dramatic improvement has culminated in the undisputed conclusion that, in many respects, the mental health facilities and staff of NDOP are among the finest available in a prison system in this country. Unfortunately, the nature of litigation requires me to focus on the perceived shortcomings of the

---

1. *Lochner v. New York,* 198 U.S. 45, 76, 25 S.Ct. 539, 547, 49 L.Ed. 937 (1905).

2. At the hearing on July 21, 1993, the two sides were only two percentage points apart; defendants claimed, in effect, that they were 100% in compliance while plaintiffs claimed defendants

were only 98% in compliance. The term "full compliance" is not necessarily one which is like a bar of soap, such as Ivory Soap's hallowed slogan—"99$^{44}$/$_{100}$% pure soap." Though often slippery, legal questions are seldom susceptible to a purely quantitative answer.

parties' efforts rather than applauding the accomplishments all agree they have achieved. Accordingly, I must determine if the seven items identified in Dr. Logan's Progress Report warrant withholding a declaration of compliance.

In his oral report on August 27, 1993, Dr. Logan stated that the seven items were "well toward resolution". His comments make it clear that defendants have completed the steps necessary to create a state of the art mental health care system: they have gathered together a superb staff, constructed new state of the art facilities, acquired and installed a state of the art computer tracking system, and made appropriate revisions in rules, practices, and documentation policies. I am satisfied that in these quantifiable "infrastructure" aspects of compliance, defendants are well beyond 100% compliance with the Stipulated Agreement and the Final Order.

The remaining issues concern the manner in which NDOP will utilize the impressive system they have created. I am satisfied that this "utilization" aspect of compliance is necessarily an ongoing process that can never be completed. Thus, "full compliance" in this regard requires a continuing effort to resolve new issues arising in the process of providing effective mental health care in a prison setting.[3] With this view of "full compliance" in mind, I must address the seven remaining items identified by Dr. Logan.

The seven items whose completion Dr. Logan considered necessary to bring defendants into full compliance were:

1. Transfer of maximum, close custody, and women inmates needing inpatient care to the Regional Medical Facility.

2. Transfer of inmates in the Southern Region needing extended care to the ECU–S at Building 5 SNCC.

3. Acquisition and utilization of the additional equipment needed to implement the tracking system on a system-wide basis.

4. Approval and implementation of the Administrative Regulations.

5. Revision of medical records on inpatient unit to include an improved admission form, problem oriented treatment plan with regular reviews, problem specific progress notes, and improved legibility of physician notes. This should be standardized in both inpatient units.

6. Utilization of tracking system data in quality assessment and timely quarterly reports.

7. Future planning based on ongoing needs assessment.

The first item on this list will require the most discussion. Therefore, I bypass it momentarily.

*Item 2* Dr. Logan reported that the transfer of inmates needing extended care to the Extended Care Unit at Southern Nevada Correctional Center had been accomplished. NDOP personnel are in the process of determining whether it is more appropriate to provide day treatment only or 24 hour on-site nursing. With the understanding that defendants must continue their best efforts to resolve this and all other issues that may arise, I find that they are in full compliance with respect to this item.

*Items 3, 6, and 7* These related items concerns the "tracking system" which is a computer system intended to link NDOP mental health facilities, monitor individual inmate patients, and maintain a database that may be used for various purposes, including evaluation of quality of treatment, generation of periodic reports, and planning. Dr. Logan reported that defendants have acquired and installed the necessary equipment throughout the NDOP system. All agree that the tracking system is "state of the art". NDOP staff have been trained in its operation and supervisory personnel have discussed with Dr. Logan its anticipated and potential uses.

**3.** Earlier, I suggested to counsel that the standards applied in school desegregation cases for closing consent decrees might provide a useful analogy. Defendants have invited me to apply the standard for "full compliance" set forth in *Oklahoma City Public Schools v. Dowell,* 498

U.S. 237, 245–49, 111 S.Ct. 630, 636–37, 112 L.Ed.2d 715 (1991). On further reflection, I conclude that the analogy is not useful at this interim stage, though it may carry great weight in the future when defendants seek dissolution of the consent decree and dismissal of the case.

The remaining concerns involve how well the defendants utilize the tracking system. With the understanding that defendants must continue to use the tracking system in general conformity with the recommendations of the monitor, I find they are in full compliance with respect to these items.

*Item 4* Dr. Logan reported that the parties had agreed upon appropriate language for proposed revisions in the Administrative Regulations to conform them to American Correctional Association Standards and the Stipulated Agreement. The revisions had not been officially approved and adopted by NDOP at the time of Dr. Logan's report. Based on the representations of defendants' counsel at the August 27 hearing and on the attachments to defendants' supplemental brief submitted September 9, 1993, I find that this item has now been accomplished.

*Item 5* Dr. Logan reported that the inpatient units had adopted revised and standardized forms for keeping medical records to his satisfaction. Accordingly, I find that this item has been accomplished.

*Item 1* Dr. Logan reported that transfer of the appropriate inmates needing inpatient care to the new Regional Medical Facility had been accomplished. However, the transfer of maximum security inmates raised new concerns that had not appeared in the seventh Progress Report. Of greatest concern to Drs. Logan and Metzner, was the impact of security procedures for these inmates on the quality of care received in the new facility.

Present security procedures require that RMF inmates be strip searched each time they leave the housing unit and each time they return. The mental health treatment programs contemplated for these inmates require them to leave the housing unit two to four times daily, on the average. Thus RMF inmates must submit to an average of four to eight strip searches daily to undergo treatment. It is expected that these inmates will experience strong adverse psychological effects from the strip searches, that they will negatively associate their treatment with the strip searches, and that some will resist and/or refuse treatment.

In addition, present procedures require all inmates in RMF to be locked in their cells when a staff person enters the housing unit. It is expected that the lock downs will inhibit therapeutic relationships and group dynamics and that the inmates will negatively associate their treatment with the lock downs.

Drs. Metzner and Logan agreed that under existing security restrictions, defendants are not providing and cannot provide RMF inmates with the quality of care required in an inpatient facility. I accept these conclusions.

On the other hand, Director Angelone contends that these security measures are in place for the good reason that the residents of RMF include individuals of a violent nature who have been convicted of unthinkably vicious crimes. The ever present potential for violence requires strict measures to ensure the safety of all involved.[4] I accept these conclusions as well.

I conclude that the present combination of treatment programs and security procedures at RMF are unacceptable as an ending point; were I faced with the decision I must make in one year, I am certain that the present situation would preclude dismissal of the case. However, in view of the substantial completion of all other aspects of the mental health care delivery system, I am willing to accept the present situation at RMF as a short term interim method of balancing security concerns and mental health interests.

Accordingly, I find defendants in full compliance in the dynamic sense of "full compliance" described above. I reach this finding with the caveat that continued compliance over the coming year will require satisfactory

---

4. While it is true that "... nobody promised [the inmates] a rose garden; ..." according to Circuit Justice Rehnquist in *Atiyeh v. Capps,* 449 U.S. 1312, 1315–16, 101 S.Ct. 829, 831, 66 L.Ed.2d 785 (1981), it is also true that nobody is entitled to promise them a jungle. If the warden or anyone on the Warden's behalf were to try to carry out such a promise, this Court would prevent it so long as the Eighth Amendment remains unrepealed. I should note that I had some association with *Atiyeh v. Capps,* at the district court level. *See Capps v. Atiyeh,* 495 F.Supp. 802 (D.Or.1980) and *Capps v. Atiyeh,* 559 F.Supp. 894 (D.Or.1982).

continuing progress toward resolution of this issue. Compliance will be evaluated based on the effectiveness of the efforts of mental health personnel and security personnel, working together with the monitor, to revise treatment programs and security procedures so that effective mental health care can be provided in a safe environment. Until this is accomplished to the satisfaction of the monitor, the case will not be closed regardless of the passing of the one year of additional compliance monitoring.[5]

## CONCLUSION AND ORDER

Based on the foregoing

IT IS ORDERED that defendants' request for a finding of compliance is GRANTED;

IT IS FURTHER ORDERED that Dr. William S. Logan will continue as monitor to evaluate continued compliance and to report to the court and the parties in that regard;

IT IS FURTHER ORDERED that the one year period for demonstrating continued compliance will commence on the date of this order.

Frankie Sue Del Papa, Atty. Gen., Cameron J. Parks, Deputy Atty. Gen., Litigation Div., Carson City, NV, for defendants.

Ernest K. Nielson, Washoe Legal Services, Reno, NV, for plaintiffs.

---

**5.** It would be a severe mistake if I did not record my deep appreciation to Messrs. Nielsen and Cardinalli for their thoroughly first rate job on behalf of their clients; to Drs. Logan and Metzner for their conscientious professionalism; to Dr. Nelson and the members of his staff and to Director Angelone; and, finally to the dedication of the class members who took the laboring oar in pressing this claim. I am grateful to all.