In re Marilyn M. MOSS, a/k/a Marilyn Margaret Bryant, a/k/a Marilyn Moss Bryant, a/k/a M. Margaret Bryant, a/k/a Marilyn Wall Bryant, a/k/a Marilyn Whitman Bryant, a/k/a Margaret ("Peggy") Whitman, a/k/a Margaret ("Peggy") Whitman Bryant, a/k/a Margaret Bryant, a/k/a Marge Bryant, a/k/a Mari Bryant, a/k/a Mary Bryant, a/k/a Anne Bryant, a/k/a Ann Whitman, a/k/a P.M. Whitman, a/k/a Ann Margaret Whitman, a/k/a Anne Margaret Whitman, a/k/a Anne M. Whitman Bryant, a/k/a Anne Margaret Whitman Bryant, a/k/a Anne Margaret Whitman Bryant Trust, a/k/a M. Whitman Bryant, a/k/a M. Margaret Whitman Bryant, a/k/a Catherine L. Whitman, a/k/a Bryant Family Trust, a/k/a Solutions, Inc., a/k/a Santa Barbara Mortgage Co., Inc., a/k/a National Supply Corporation, a/k/a TCI Industries, a/k/a TCI Investments, a/k/a T.N. Ayrb Inv. Co., a/k/a Transpacific Conservancy, Inc., a/k/a M. Margaret Whitman Bryant Trust Dated April 18, 1997, a/k/a M. Margaret Whitman Bryant Trust Dated May 18, 1997, Debtor.

**Steven C. Block, Trustee, Plaintiff,**

v.

**Marilyn M. Moss, et al., Defendants.**

Bankruptcy No. 98–43272–1.
Adversary No. 00–4091–1.

United States Bankruptcy Court,
W.D. Missouri,
Western Division.

Feb. 7, 2001.

See also 258 B.R. 391, 258 B.R. 427.

408

Marilyn M. Moss, pro se.

Steven C. Block, Kansas City, MO, trustee.

## MEMORANDUM OPINION AND ORDER

JERRY W. VENTERS, Bankruptcy Judge.

In this Adversary Proceeding, the Trustee, Steven C. Block ("Trustee"), seeks to avoid, as allegedly fraudulent, the transfer of all of the property of the Debtor, Marilyn M. Moss ("Debtor" or "Moss"), to a self-settled trust purportedly established by the Debtor or to a corporate

entity set up by the Debtor. The Trustee also seeks the entry of a declaratory judgment finding that all of the Debtor's property was transferred to either the trust or the corporate entity with the intent to defeat creditors, that the Debtor intended to conceal the property from the Trustee and creditors, and that all of the property so transferred is property of Moss's bankruptcy estate.

Pursuant to a previously entered consolidation order, the Court conducted a consolidated hearing in this Adversary Proceeding, three other Adversary Proceedings, and various pending motions on November 15–17, 2000. At that time, the Debtor appeared *pro se* and presented evidence on her own behalf; the Trustee appeared in person and as counsel for the Trustee and presented evidence; and Bruce E. Strauss, representing creditors Gronemeier & Barker and Burton & Norris, also adduced evidence. At the conclusion of the hearing, the Court took all matters under advisement. The Court has reviewed the extensive evidence that was received, has conducted its own research of the numerous legal issues presented, and is now ready to rule.

The Court has jurisdiction of this matter pursuant to 28 U.S.C. § § 1334 and 157(a). This Adversary Proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (E), (H) and (O). This Memorandum Opinion and Order constitutes the Court's findings of fact and conclusions of law pursuant to Rule 52, FED. R. CIV. P., made applicable to bankruptcy proceedings by Rule 7052, FED. R. BANKR. P.

## FACTUAL BACKGROUND

Although this Chapter 7 case was filed just over two years ago, in August 1998, the events that gave rise to the filing have their origin in a sexual harassment lawsuit filed more than ten years ago by the Debt-

or in California. That lawsuit was settled in 1992 in favor of the Debtor, and the Debtor received a gross settlement of $3,000,000.00. From that settlement, there ensued a long series of events that bring us to this point. Because of the largely factual nature of the disputes between the Debtor and the Chapter 7 Trustee, the factual background of this case takes on added importance, and will be developed in some detail in this Memorandum Opinion and Order.

In 1989, the Debtor filed a sexual discrimination and harassment lawsuit in the United States District Court for the Central District of California against Santa Fe Terminal Services, Inc., her employer; William J. Fitzgerald, a supervisor; Santa Fe Southern Pacific Corporation; and the Atchison, Topeka and Santa Fe Railway Company (collectively "Santa Fe"). Originally, Moss was represented in this litigation by John C. Burton and John E. Huerta and their law firms, Burton & Norris and Gronemeier & Barker of Pasadena, California, under a retainer agreement entered into on May 27, 1987. However, before the matter went to trial, Moss discharged Burton and Huerta and retained another attorney, Peggy Garrity, of Santa Monica, California. After a month-long trial, a settlement was reached during jury deliberations and Santa Fe agreed to pay Moss $3,000,000.00 in full settlement of all claims. A judgment in that amount was entered on June 22, 1992. (Ex. 1)

Garrity received a contingency fee of $1,350,000.00 from the settlement, leaving Moss with net proceeds of $1,650,000.00. However, Moss testified that she was required to pay almost $300,000.00 in costs and expenses, and therefore she ended up with something in excess of $1,300,000.00 from the settlement.[1]

At or about the time the Santa Fe case went to trial, Moss, with Garrity as her

---

1. Contrary to Moss's testimony at trial, there is no indication in the documents admitted in evidence that Moss ever paid $300,000.00 in costs and expenses associated with the Santa Fe litigation. The Court does not believe that Moss ever paid any such costs and expenses.

attorney, sued Burton, Huerta, and their law firms in the Los Angeles County Superior Court for legal malpractice, breach of contract, and negligent infliction of emotional distress, all with respect to their handling of Moss' lawsuit against Santa Fe. The attorneys responded with a cross-complaint in which they asserted that Moss owed them a substantial sum for the legal services they had provided. The attorneys requested that this issue be submitted to binding arbitration, as provided in the retainer agreement, and that request was granted over Garrity's objections. (Ex. 3) This arbitration was conducted by the Los Angeles County Bar Association, which on May 26, 1993, awarded Burton, Huerta, and their law firms $600,000.00 in fees plus $54,833.33 in interest (a total of $654,833.33) for their representation of Moss in the Santa Fe litigation. (Ex. C007) The arbitration award was confirmed by the Superior Court, which further awarded the attorneys $96,318.90 for their fees and expenses in the arbitration and court proceedings. (Ex. C008) Moss appealed the Superior Court judgment, and on June 27, 1995, the California Court of Appeal, in an unpublished opinion, affirmed the judgment for $654,833.33 but disallowed the $96,318.90 that had been allowed by the Superior Court for the attorneys' fees and costs, ruling that fees and costs could not be allowed when the attorneys had represented themselves in the litigation. (Ex. C009) The California Supreme Court denied review. Upon remand, the Superior Court entered a modified judgment awarding the attorneys $654,833.33 (the amount of the arbitration award) plus additional accrued interest of $207,573.19 through November 14, 1996. This judgment was to bear interest at the rate of ten per cent per annum until paid. (Ex. C011) Once again, the Debtor appealed to the California Court of Appeal, which rejected all of the Debtor's attacks on the judgment and spe-

cifically held that the attorneys "must be paid their fees as determined by the arbitration." (Ex. C012) Subsequently, Moss attempted to remove this case (as well as another case brought by the attorneys for fraudulent transfer) to the United States District Court, but the District Court remanded to the state courts on the grounds that removal was improper. (Ex. C012) [2]

Shortly after the settlement of the Santa Fe litigation, Moss opened a securities account at a Dean Witter Reynolds office in Woodland Hills, California, with a deposit of $1,650,000.00, presumably the net proceeds of the settlement after payment of Garrity's contingency fee. (Ex. 238D). Soon thereafter, Moss transferred substantial sums to accounts which she opened in her name at Wells Fargo and Merrill Lynch ($200,000.00 each; Ex. 238E, F). Additionally, she transferred $100,000.00 to her parents and paid $59,637.30 to purchase a 1992 Mercedes automobile (Ex. 238E), which she initially registered in her name in August 1992. (Ex. 286)

Commencing later in 1992, Moss set about establishing a number of corporations in which she was the sole shareholder, in which she placed (at one time or another) much of the money received from the Santa Fe settlement, and which she contended were intended to support her and pay her living expenses and the like. (Ex. 35, pp. 59–60, 76) Moss asserted at trial that these entities were set up "to preserve assets." In September 1992, Moss incorporated Solutions, Inc. (Ex. 375), and in July 1993 she set up a company known as Santa Barbara Mortgage Company, Inc. (Ex. 374)

As the arbitration proceedings related to the claims for attorneys' fees began to progress, Moss began to transfer many of her assets to these corporations. For example, in April 1993 (the month the Los

2. According to the Court of Appeal, Moss filed a second malpractice action against the attorneys, and she also filed another Superior Court and two federal court actions to enjoin the arbitration, all of which were either dismissed or became dormant. Ex. C009, p. 4.

Angeles County Bar Association set the arbitration matter for hearing), Moss transferred $285,333.00 in cash and securities from her personal account at Dean Witter to a Dean Witter account that had been established for Solutions, Inc. (Ex. 238N, P) In May 1993, Solutions apparently purchased a 1992 Toyota automobile (Ex. 289) and purchased a house at 1724 Ocean Drive in Oxnard, California (Ex. 5A) which was subsequently valued at $490,000.00 ("the Oxnard house"). On July 14, 1993, less than a month after notice of the arbitrators' award was mailed to Moss, Solutions, Inc., granted a deed of trust for $685,500.00 on the Oxnard house to Santa Barbara Mortgage Company, Inc., even though Santa Barbara Mortgage Company had not yet been incorporated. M. Margaret Bryant, a name frequently used by the Debtor, was named as the trustee on the deed of trust.[3] (Ex. 35, attached exhibit 9) Similarly, in July 1993, title to the 1992 Mercedes was transferred to Solutions, Inc., with a lien noted to "M. Margaret Bryant TR, Bryant Family Trust." (Ex. 287) In July and August 1993, the assets in the Solutions, Inc., account at Dean Witter were transferred to a similar account at Prudential Securities. (Ex. 238S, T)

On September 28, 1993, Burton & Norris and Gronemeier & Barker recorded an abstract of their Superior Court judgment in the Ventura County recorder's office and notice of that filing was mailed to Moss (Ex. 7A), and on October 7, 1993, the attorneys caused Moss to be personally served with an order to appear for a judgment debtor examination. The following day, October 8, 1993, Moss, acting *pro se*, filed a voluntary Chapter 7 bankruptcy petition in the Bankruptcy Court for the

Central District of California, in which she listed assets of only $3,100.00 and liabilities of $1,514,109.45. (Ex. 8A) Less than a week later, on October 14, 1993, Moss, using the name of M. Margaret Bryant, opened a new investment account for Santa Barbara Mortgage Company at Prudential Securities with an initial transfer of $208,000.00. A notarized statement accompanying the account application and signed "M. Margaret Bryant" stated that she was the sole owner of Santa Barbara Mortgage Company, Inc. (Ex. 249A)

Also in October 1993, and shortly after she had filed bankruptcy in California, Moss established another corporation, National Supply Corporation, in Nevada. Moss testified in a § 343 examination in her California bankruptcy proceedings that the sole purpose of National Supply Corporation was to loan money to Santa Barbara Mortgage Company so that Santa Barbara Mortgage Company could loan that money to Solutions, Inc., so that Solutions, Inc., could buy "more depressed properties." All of the money which National Supply Corporation had was obtained from Moss's proceeds of the Santa Fe settlement. (Ex. 35, pp. 77–80) Then, in late October 1993, Marilyn Margaret Bryant, Solutions, Inc., and Santa Barbara Mortgage Company signed financing statements that purported to give National Supply Corporation blanket liens on all of their personal property; these financing statements were recorded in the Secretary of State's office on October 29, 1993. (Exs. 281, 282, 283)

On November 19, 1993, while in bankruptcy, Moss obtained a California identification card in the name of Marilyn Margaret Bryant. (Ex. 215A–1)

---

**3.** Found among the papers in the Debtor's possession or control after her apprehension by the Federal Bureau of Investigation in February 1999 were two forged marriage certificates purporting to show that a Marilyn Margaret Moss married a Lawrence David Bryant on August 21, 1993, in the Lake Tahoe Wedding Chapel in Stateline, Nevada, and that an Anne Margaret Whitman married a

Thomas James Bryant on that same date in the same place. Both "certificates" have the same serial or identification numbers and bear false recording information. (Exs. 181A, 140B–1, 236) Moss used the names "M. Margaret Whitman" and "Margaret Whitman Bryant" on numerous documents admitted in evidence.

**412**

On December 7, 1993, now represented by counsel, Moss filed amended schedules in her California bankruptcy proceedings in which she disclosed that she was the owner of Solutions, Inc., Santa Barbara Mortgage Company, Inc., and National Supply Corporation, and that those entities had assets of $1,040,000.00, $208,000.00, and $69,000.00, respectively. She also stated that the Bryant Family Trust owned two automobiles with a value of $58,000.00. (Ex. 10A) In her § 343 examination in December 1993, Moss admitted that the persons (other than herself) who had been listed as officers and directors of Solutions, Inc., and Santa Barbara Mortgage Company did not know that they had been so listed; she stated that the corporations had been set up "to support me [Moss] for the rest of my life." (Ex. 35, p. 60) In late December 1993 and early January 1994, the ownership registrations for the 1992 Mercedes and the 1992 Toyota that had previously been purchased by Moss were transferred to Solutions, Inc., with liens indicated in favor of Marilyn Margaret Bryant. (Exs. 288, 290) On January 12, 1994, Marilyn Margaret Bryant paid $29,012.97 cash to a Reno, Nevada, car dealer for the purchase of a 1994 Dodge van, which was subsequently titled in Nevada in the name of Marilyn M. Bryant. (Exs. 293, 160) Moss admitted in testimony before this Court that she did not have Bankruptcy Court permission to purchase the Dodge van; she insisted that it was purchased "in the regular course of business" and therefore the Court's permission was not required.

After unsuccessful attempts to dismiss her bankruptcy proceedings, Moss converted the Chapter 7 case to a case under Chapter 11 on February 2, 1994. (Ex. 24B) Shortly before the conversion to Chapter 11, on January 27, 1994, a Deed of Full Reconveyance was recorded with respect to the Oxnard house. This deed was signed by M. Margaret Bryant as trustee for Santa Barbara Mortgage Company, Inc., and released the lien held by Santa Barbara Mortgage Company on the Ox-

nard house, which was originally for $685,500.00. At the same time, in a Corporation Grant Deed executed by Marilyn M. Bryant as president and secretary, Solutions, Inc., conveyed the Oxnard house to Marilyn Bryant individually. This deed recited that Solutions, Inc., was being dissolved, and that the conveyance "transfers the Corporation's interest [in the personal residence] into the name of the transferee who owned the entire issued stock of the Corporation..." (Exs. 12A, 13A) Moss testified before this Court that Solutions, Inc., was dissolved on the advice of her attorney. Subsequently, on February 24, 1994, a second corporation, Santa Barbara Mortgage Company, Inc., was dissolved. (Ex. 39) Later, on May 5, 1994, Marilyn Margaret Bryant granted a deed of trust in the Oxnard house to "Katwalk Pacific Mfg. Division, N.S. Corp." (Ex. 15A) When she was arrested, Moss had in her possession business cards showing Marilyn Bryant as owner of "National Supply Corp., Katwalk Pacific Mfg. Div." in Reno, Nevada. (Ex. 284) According to Neil J. Barker, one of the partners in Gronemeier & Barker, this deed of trust was recorded without Bankruptcy Court permission, and on May 16, 1994, Marilyn Moss Bryant recorded a Notice in the Ventura County recorder's office stating that the deed of trust was "suspended" until and unless Bankruptcy Court approval was obtained for any borrowing by the Chapter 11 Debtor-in-Possession. (Ex. 16A)

While still in Chapter 11, Moss established yet another corporation, Transpacific Conservancy, Inc., on August 8, 1994. (Ex. 155A) The Debtor acknowledged before this Court that Transpacific Conservancy, Inc., was set up without the California Bankruptcy Court's approval, but asserted that it was set up "in the ordinary course of business" and "the Judge was aware of it." Moss testified that the United States Trustee was not aware of the establishment of the corporation in Chapter 11, and that there was no reason for the Trustee to know of it because it

was simply an "investment vehicle." Moss further testified that the purpose for Transpacific Conservancy, Inc., was "to preserve the assets of the bankruptcy estate" and that it was set up in Nevada because Nevada did not have a state income tax. She testified that her attorney advised her to move all assets from the California corporations to Transpacific Conservancy, Inc., so that the earnings would be free of state income tax. An Application for Employer Identification Number signed by Marilyn Bryant on July 28, 1994, disclosed that the trade name for the corporation was "T.N. Ayrb Inv. Co." [4] (Exs. 155A, 156) Incidentally, almost two years later, on May 26, 1996, Marilyn Bryant conveyed the Oxnard house to T.N. Ayrb Inv. Co. (Ex. 22B)

In October 1994, an investment account was opened for Transpacific Conservancy, Inc., at Charles Schwab in San Francisco, with an opening deposit of $5,000.00; within a matter of months, the account exceeded $50,000.00. (Ex. 232) An account was also established for Transpacific Conservancy, Inc., at A.G. Edwards & Sons, Inc., in Reno, Nevada; on October 31, 1994, the account contained assets worth $37,782.61. (Ex. 170) By February 28, 1995, the account had a portfolio value of $75,261.66. (Ex. 171) In December 1994, Marilyn Bryant, with an address in Reno, Nevada, registered the fictitious name of "TCI Industries" with the Nevada Secretary of State (Ex. 220A); apparently, this was an abbreviation for Transpacific Conservancy, Inc. At the end of March 1995, Transpacific Conservancy, Inc., had an account at Quick & Reilly, a stock brokerage firm in Las Vegas, Nevada, with a value of $75,386.00; the monthly statement was addressed to Marilyn Bryant in Las Vegas. (Ex. 162) In April 1995, Marilyn Moss Bryant had an investment account at Alliance Fund/U. S. Clearing Corp. in Las Vegas in which there were securities with an apparent value of approximately $25,000.00 (Ex. 188A); however, before the end of the month, all assets had been transferred out of the account. (Ex. 188B) Also in April 1995, Transpacific Conservancy, Inc., had an account at Smith Barney in Las Vegas with a portfolio value of $37,998.99. (Ex. 168) By May 26, 1995, the balance in the Transpacific Conservancy, Inc., account at A.G. Edwards had been reduced to $2,787.13, whereas the value of the Quick & Reilly account had jumped to $84,011.70. (Exs. 174, 165) The addresses on most of these accounts was the same: 3151 North Rainbow, # 247, Las Vegas, Nevada.

While these events were transpiring, Moss remained under the jurisdiction of the Bankruptcy Court for the Central District of California, and Moss was pursuing her appeal of the judgment of the Superior Court affirming the lawyers' arbitration award against her. However, on June 27, 1995, the California Court of Appeal filed its first opinion upholding the arbitration award but holding that the Superior Court had improperly awarded the attorneys $96,318.90 in attorneys' fees and expenses. (Ex. C009) On September 27, 1995, the Court of Appeal issued its Remittitur Notice stating that the Court's order was final and directing the remittitur of the disallowed attorneys' fees and expenses. (Ex. C010) On April 25, 1996, Moss sent a letter to the Bankruptcy Judge, the U.S. Trustee, and an attorney for the creditor law firms and advised them that she had investments with a value of approximately $425,000.00. Moss listed eight different funds or investments by name and approximate value, but did not disclose where those investments were held or that they were not held in her name. (Ex. 19) Moss maintained in that letter, as she has throughout these proceedings, that all of her investments were legally exempt because they were traceable to her "personal

---

4. The name Bryant spelled backwards is tnayrB, and apparently is the source for the trade name of "T.N. Ayrb Inv. Co."

injury" judgment in the Santa Fe litigation.

In the course of her California bankruptcy proceedings, Moss challenged the proof of claim filed by Burton & Norris and Gronemeier & Barker for their attorneys' fees as awarded by the arbitration panel and as confirmed by the Superior Court and the Court of Appeal. The Bankruptcy Court, in a 13–page opinion filed on May 10, 1996, ruled that all issues concerning the claim had been fully litigated in the state courts and that those decisions were final and entitled to *res judicata* effect; accordingly, the Bankruptcy Court allowed the attorneys' claim, which is the same claim being asserted in these proceedings. Likewise, the Bankruptcy Court sustained the attorneys' objections to Moss's claims that the proceeds of her Santa Fe settlement were legally exempt. (Ex. 20A)

Then, after almost three years in bankruptcy, the California Bankruptcy Court abruptly dismissed Moss's Chapter 11 proceedings on May 28, 1996. (Ex. 23A) On that same day, Marilyn Bryant transferred the Oxnard house to T.N. Ayrb Inv. Co. (Ex. 22B)

On June 12, 1996, a 1996 Winnebago was purchased for $64,768.00 from a dealer in Carson City, Nevada, in the name of Transpacific Conservancy, Inc. (Ex. 270A) Insurance cards found in Moss's possession were issued effective June 11, 1996, in the names of both Marilyn Bryant and Transpacific Conservancy, Inc., by State Farm Mutual Automobile Insurance Company through the same agent. (Exs. 270B, G) On September 6, 1996, just three months later, the Winnebago was titled in Arizona to the "M. Margaret Whitman Bryant Trust, Margaret Whitman Bryant, TR." (Ex. 357) On July 2, 1996, Marilyn Margaret Bryant or TCI Industries purchased a 1996 Toyota in Reno, Nevada, and the vehicle was insured in the name of Marilyn Bryant d/b/a TCI Industries. (Exs. 212A–1, B–1) On September 25, 1996, the 1996 Toyota was titled in Arizona to the "M.

Margaret Whitman Bryant Trust, M. Margaret Whitman Bryant, TR." (Ex. 359)

Soon after the Chapter 11 bankruptcy was dismissed in May 1996, Burton & Norris and Gronemeier & Barker renewed their efforts to satisfy their judgment against Moss. On October 22, 1996, the attorneys obtained an Order directing Moss to appear for a judgment debtor examination on December 4, 1996. (Ex. 45) On October 25, 1996, the attorneys filed a fraudulent transfer action against Moss, "also known as Marilyn Bryant, Marilyn Margaret Bryant, and Marilyn Moss Bryant," and against "T.N. Ayrb Inv. Co., an entity of unknown nature..." (Ex. 26A) Moss unsuccessfully attempted to remove this action to federal court; an Order remanding the case to state court was entered on December 19, 1996. (Ex. 28) On November 20, 1996, the attorneys obtained a second Order for a judgment debtor examination because Moss had successfully obtained an order quashing the Order issued on October 22. (Ex. 46) The judgment debtor examination was scheduled for January 6, 1997, but Moss failed to appear, after an unsuccessful attempt to have the case removed to federal court. (Ex. 50) Moss also failed to appear for a rescheduled examination on January 23, 1997, and was found in contempt of court. (Ex. 51)

Also in December 1996, the California Court of Appeal, for the second time, affirmed the trial court judgment awarding attorneys' fees to Burton & Norris and Gronemeier & Barker. (Ex. 29)

During January 1997, the four vehicles owned in the name of Marilyn Bryant were insured in that name in Nevada. (Exs. 203C, 367C, 111C, 366D) On January 8, 1997, a Nevada driver's license was issued to Marilyn Margaret Bryant, with the same birthdate as Marilyn Moss (namely, February 25, 1947), and a photograph that appears to be Moss's. (Ex. 140G–1) Then, on March 27, 1997, an Arizona driver's license was issued to Margaret Whitman

Bryant, with the same birthdate of February 25, 1947, and a photograph that appears to be Moss's, though the hair color has changed from blonde to dark brown. (Ex. 96A–1)

In February 1997, Moss asked the U.S. District Court that had heard the Santa Fe lawsuit to reopen that case (nearly five years after the settlement and dismissal of the case) for the purpose of taking up the attorneys' fee issues. The District Court refused to re-open the case, holding that to do so would amount to an improper collateral attack on the state court judgment against Moss. (Ex. 30)

On April 18, 1997, the Anne Margaret Whitman Bryant Charitable Trust was purportedly established by a person using that same name, Anne Margaret Whitman Bryant. The original copy of a document entitled "Declaration of Trust" was found among Moss's possessions when she was arrested by the FBI in February 1999. (Ex. 208A) Anne Margaret Whitman Bryant is named as both the Trustor and Trustee of the Trust; however, the "Declaration of Trust" does not name any beneficiary. Nor does it include Schedule A, a listing of the property purportedly transferred to the Trust, though reference is made to such a schedule. The Debtor did not at any time in these proceedings produce any other documentation relating to this Trust, despite the fact that she claims all of her property was transferred to the Trust and is therefore not included in her bankruptcy estate. At trial, Moss testified that the Trust was established for estate planning purposes, that the property in the Trust would be used for her benefit during her lifetime, and that upon her death the Trust assets would be used to care for abused animals. However, none of these provisions was included in the Trust instrument.

The waters surrounding the purported Trust are further muddied by a second "Declaration of Trust" produced at trial by the Trustee. A copy (not the original) of this second Trust document was also found in Moss's possession. This second Trust is in the name of M. Margaret Whitman Bryant and bears a date of May 18, 1997, instead of April 18, 1997, the date on the first Trust document. In all other respects, the documents are the same. Both purport to be notarized by the same notary public in Coconino County, Arizona. (Ex. 108) At trial, Moss testified that the Trust had been set up in 1996, and she was not able to explain the May 18, 1997, date on Ex. 108. Moss did not offer any other evidence to prove that any trust was established in 1996.

At her § 341 meeting of creditors on July 5, 2000, Moss testified that the Trust document dated May 18, 1997, was incomplete, but that she did not know where the remainder of the document was. She acknowledged that she had signed the document, and that the purpose of the Trust was to care for her during her lifetime. (Ex. 355, pp. 24–28) In May 1997, the Internal Revenue Service issued an employer identification number for the M. Margaret Whitman Bryant Trust. (Ex. 219K)

At various times in mid–1997, Moss insured her various vehicles in either Nevada or Arizona in the names of Margaret Bryant, Marilyn Bryant, and the M. Margaret Whitman Bryant Trust. (Exs. 368A, 368B, 365, 366C, 139B)

Then, in September 1997, Moss opened an account at Citizens Bank of Tulsa in Tulsa, Oklahoma, in the name of the M. Margaret Whitman Bryant Trust. (Ex. 153A) In October 1997, she transferred a City of Industry (California) bond with a face value of $20,000.00 from Transpacific Conservancy, Inc., to M. Margaret Whitman Bryant. (Exs. 302A–D) Also in October 1997, Moss (acting in the name of Marilyn Bryant) moved by common carrier a substantial amount of household goods from Gardnerville, Nevada, to Tulsa. (Exs. 277C, D)

In the first half of 1998, Moss registered her 1992 Mercedes and the 1996 Winneba-

go in Arizona in the name of the M. Margaret Whitman Bryant Trust. (Exs. 91A–1, 252A)

After Burton & Norris and Gronemeier & Barker had recorded a *lis pendens* and had obtained a judgment against Moss in the fraudulent transfer action, the entity known as T.N. Ayrb ·Inv. Co., by deed dated April 9, 1997, transferred the Oxnard house to a Catherine L. Whitham of Scottsdale, Arizona. (Ex. 43) In early June 1998, the law firms, unaware of the supposed transfer to Whitham, obtained a writ of execution on the property and completed the steps necessary to levy on the property toward the end of June 1998. However, on July 1, 1998, an unverified claim was filed on behalf of Whitham in which Whitham claimed to own the property and to have a claim superior to all others with respect to the property. (Ex. 52) The law firms challenged this third-party claim and on August 10, 1998, a commissioner of the Superior Court in Los Angeles ruled that the Whitham claim was invalid and held that the sheriff was not prevented from executing the writ of execution on the property. (Ex. 59) Interestingly, the attorneys were unable to locate the Scottsdale lawyers who supposedly prepared the pleadings on behalf of Whitham, and Whitham never appeared for any hearings. It is likely that Whitham was a nonexistent person created by Moss.

Meanwhile, on August 6, 1998, Moss filed her Chapter 7 bankruptcy petition in this Court, listing less than $2,500.00 in assets and more than $900,000.00 in liabilities. (Ex. 53) The Debtor did not list as an asset the account at Citizens Bank of Tulsa in the name of the M. Margaret Whitman Bryant Trust, although the account had a value of nearly $40,000.00. (Ex. 219A) In fact, Moss did not disclose the existence of any trust and did not disclose that she might have a beneficial interest in any trust.

On August 27, 1998, Moss filed an Application asking the Court to continue the § 341 meeting for 30 days and asking that accommodations be made for her on the grounds that she was disabled as a result of multiple sclerosis. Moss declared in an affidavit that she had lost control of her bowels and bladder and that her vocal cords "are useless and I have difficulty speaking." She asked that she be allowed to respond to any questions by the Trustee in writing. This application was accompanied by a purported affidavit of a "Dr. Joseph Lindsay," who, among other things, stated that "it is physically impossible for Ms. Moss to travel or communicate by speaking." (Ex. 57A) Shortly thereafter, Gronemeier & Barker and Burton & Norris filed a motion for relief from the automatic stay, seeking leave to execute on the Oxnard house in California (Ex. 60) and an expedited hearing was set for September 8, 1998. (Ex. 61) However, the attorneys were unable to locate Moss and the hearing was then continued to September 29, 1998. On September 28, 1998, Moss filed an objection to the request for relief from the stay, alleging that she had not received adequate notice, and further requesting that the Court grant her a discharge because "[t]his is a very simple case where there are only two creditors and both debts are dischargeable. Debtor prays this Court will discharge the debt so that this matter can expeditiously conclude." (Court file, Document 12)

At the hearing on September 29, 1998, the Court[5] granted the California law firms relief from the automatic stay and denied the Debtor's request for a discharge of her debts. In fact, not only did the Court deny the Debtor's request for a discharge, on October 16, 1998, the Court, acting *sua sponte*, entered an Order indefinitely extending the time for filing complaints to determine dischargeability of debts pursuant to § 523, complaints ob-

---

**5.** The Honorable Karen M. See was handling the case until January 31, 1999, when her

resignation as a bankruptcy judge took effect.

jecting to the Debtor's discharge pursuant to § 727, and motions to dismiss pursuant to § 707(b).[6]

Then, on November 3, 1998, the Court, stating that it "remains troubled by the status of this pending Chapter 7 proceeding," entered an Order directing the Debtor to provide certain information to the Court and the Trustee, including the Debtor's actual residence address and how long she had lived there, all names and aliases used by the Debtor in the last 10 years, a comprehensive description of the Debtor's alleged medical disability, and the address and telephone number of the "Dr. Joseph Lindsay" who had executed the declaration filed on August 27, 1998, concerning Moss's medical problems and disabilities. The Debtor never responded to this Order. However, on November 23, 1998, an even more startling document was filed with the Court. This document was titled "Notification of Death of Debtor Marilyn Moss" and was purportedly signed by a "Jonathan Lindstrom," who stated that he was the administrator of the Last Will and Testament of Marilyn Moss, that Moss had been rushed to a hospital on November 15, 1998, with "an extreme migraine headache," that Moss died in the emergency room of a brain aneurysm, and that the few assets left in the estate "must be used to pay for Marilyn Moss (sic) coffin and tombstone." (Doc. No. 18)

Interestingly, on February 5, 1999, the purportedly deceased Moss opened an account with Prudential Securities, Inc., in Tulsa, Oklahoma, under the name of M. Margaret Whitman Bryant (Exs. 141A and 141B) and deposited 20,000 "City of Industry" securities. (Exh. 183) On February 16, 1999, Moss purchased 20,742 Prudential Moneymart Assets Fund at $1.00.[7] (Ex. 142)

Some time thereafter, Moss was charged with bankruptcy crimes in two indictments issuing out of the District Court, on charges relating to the two "pleadings" filed in this Court, and in late February 1999, Moss was arrested and taken into custody.

In October 1998, at about the time the California law firms were seeking relief from the automatic stay in these proceedings, the attorneys learned that numerous forged documents had been filed in the various California lawsuits that were designed to terminate those proceedings. On October 27, 1998, Barker, the lead attorney in the California lawsuits, learned that a document bearing his forged signature had been filed on October 2, 1998, dismissing with prejudice the action that had been brought in Ventura County to enable the law firms to execute on the Oxnard house. (Ex. 67) Upon investigation, Barker learned that documents bearing his forged signature had also been filed in the fraudulent conveyance and legal malpractice lawsuits in the California courts, one of which purported to be a satisfaction of the law firms' judgment against Moss. (Ex. 263) The California courts granted Barker's requests to strike or set aside the forged pleadings and restored the cases to their dockets for further proceedings.

Subsequently, Barker learned that the Oxnard house had been damaged by a fire on November 16, 1998. Barker testified, without objection, that he had learned from fire investigators that the fire was considered to be arson and that Moss had been seen in the vicinity of the house shortly before the fire occurred. On cross examination by Moss, Barker testified that he personally believed that Moss had set the fire. Moss denied having done so. In any event, Barker stated that the damages

---

6. In entering this Order, the Court stated that it was "troubled by irregularities contained in the bankruptcy schedules and pleadings filed" in the case and noted that the Debtor had not appeared before the Trustee and creditors for examination. (Doc. No. 13)

7. Needless to say, these transactions took place without the permission or knowledge of the Bankruptcy Court.

to the house, which had been valued at $490,000.00, were approximately $150,000.00 to $200,000.00 (this included damage caused by someone putting sand in the plumbing). Eventually, in May 2000, the sheriff sold the house at a sheriff's sale (Ex. 376); Barker's law firm purchased the property for $300,000.00 and credited that amount to the judgment owed by Moss.

At trial, Moss acknowledged that personal belongings, household goods, and some office equipment, among other things, are stored in rented storage units in Oklahoma, Arizona, and New Mexico. She also acknowledged that the Mercedes automobile and the Dodge van are in storage units in New Mexico. Exhibits offered in evidence by the Trustee showed that two of the units, at least, were rented in late 1998 in the name of "Bryant" or "Marge Bryant." (Exs. 74A, 217A)

Through much of these bankruptcy proceedings, Moss has asserted that she was, at the time of filing the bankruptcy petition, a resident of Arizona. However, Moss never testified as to any residence she maintained in Arizona and never adduced any documentary evidence that might establish that she was a resident of Arizona. Exhibits offered in evidence by the Trustee show that, both before and after the bankruptcy petition was filed on August 6, 1998, Moss (using various aliases) licensed and insured her vehicles in Arizona. When Moss was arrested in early 1999, the FBI found in her possession two driver's licenses, one issued by the State of Nevada on January 8, 1997 (it appears) in the name of Marilyn Margaret

Bryant, and the other issued by the State of Arizona on March 27, 1997, in the name of Margaret Whitman Bryant. (Exs. 104G–1, 229A)[8] These facts, standing alone and without any corroboration whatsoever from the Debtor, do not convince the Court that Moss was a resident of Arizona, either when she filed her bankruptcy petition or at any other time. There is much more ample evidence that Moss was a resident at various times of California and Nevada, and the overwhelming impression is that she was living a nomadic existence—presumably in her Winnebago—in the last year or two prior to the bankruptcy filing in Missouri.

## DISCUSSION

### I

Before the Court embarks on its discussion of the issues presented in the Trustee's Complaint, we address the evidentiary objections raised by Moss at trial.

Because of the large number of evidentiary exhibits (over 350) produced at trial by the Trustee, the Court took the step of allowing the Trustee to make an expedited offer of evidence on the first day of the trial, and then allowed the Debtor to submit a written list of her objections on the second day of trial (November 16, 2000). The Debtor represented that she had no objections to this procedure.

Pursuant to the agreed procedure, the Debtor submitted her list of "Evidentiary Objections at Trial" which contained a number of specific objections and two "blanket" objections, one on the basis of hearsay and one on the basis that all of the

---

8. Both licenses appear to be authentic; when held at a certain angle, the state seals can be seen on each license. The birthdate on each license is shown as February 25, 1947, Moss's acknowledged birthdate. However, the photographs on the licensee are quite different, as are the noted physical descriptions. On the Nevada license, "Bryant" is described as 5'9" tall, with blonde hair and green eyes, and weighing 120 pounds. In the photograph, the licensee is very blonde and is wearing glasses. On the Arizona license, "Bryant" is described as 5'9" tall, weighing 140 pounds, with brown hair and blue eyes. In the photograph, the licensee appears to have brown hair and is not wearing glasses. Despite these differences, the Court believes that the person whose photographs appear on the licenses are one and the same person, and that that person is the Debtor, Marilyn Moss. Over the course of these bankruptcy proceedings, Moss has appeared before the Court with blonde hair, brown hair, and black hair.

exhibits seized by the FBI were seized illegally and were therefore inadmissible. The Court has reviewed both the Debtor's specific and blanket objections, and for the following reasons, we determine that all of the exhibits offered by the Trustee (with the exception of those already excluded) are admissible over the Debtor's objections.

The objections raised by the Debtor were numerous. To summarize, her objections were based on relevancy (FED. R. EVID. 401), authenticity (FED. R. EVID. 901), lack of personal knowledge (FED. R. EVID. 602), prejudice/cumulativeness (FED. R. EVID. 403), and most frequently, hearsay (FED. R. EVID. 801). Because of the sheer number of exhibits produced by the Trustee, it is impractical to address each exhibit and each objection individually here. However, the evidence can be categorized by source and substance in a way that allows us to determine the admissibility of each exhibit.

By source, the evidence consisted of (1) personal property and documents seized by the FBI from the Debtor's person at the time of her arrest and from a Winnebago allegedly owned by the Debtor, (2) personal property and documents recovered by the Trustee from storage units rented by the Debtor, and (3) original or certified documents obtained by the Trustee from various sources (*e.g.*, California Bankruptcy Court documents, investment account statements accompanied by affidavits from said statements' custodians, etc.). By substance, the exhibits fall into two broad categories: (1) certified or original documents pertaining to the Debtor's identity (*i.e.*, her aliases), property or financial affairs and (2) other documents pertaining to the Debtor's identity, property or financial affairs.

First we make some initial, overarching determinations.

■ (1) The Court finds that all of the exhibits offered by the Trustee and not previously excluded, are relevant and not prejudicial or cumulative. Evidence may be excluded if its probative worth is "substantially outweighed" by one or more of the countervailing factors listed in Rule 403, which include unfair prejudice and the needless presentation of cumulative evidence. FED. R. EVID. 403; Wright & Graham, FEDERAL PRACTICE AND PROCEDURE: EVIDENCE § 5214 (1978). The Court does not believe that any of the evidence was unfairly prejudicial—the fact that evidence incriminates a defendant does not in and of itself make it prejudicial—and despite the numerosity and occasional overlap of some of the exhibits, the Court believes that their presentation was not needless or cumulative

■ (2) The Court finds that all of the documents which are certified copies of official documents (such as court documents or original certificates of title for automobiles), or accompanied by an authenticating affidavit are admissible. FED. R. EVID. 902.

■ (3) The Court finds that the Debtor's contention that the exhibits seized by the FBI are inadmissable on the basis that their seizure was allegedly illegal is without merit. At the present time, the District Court's ruling that the seizure was legal stands. The fact that the Debtor has appealed the District Court's ruling is irrelevant; in the absence of a stay pending appeal or a reversal by a higher court, we will follow the final order of the District Court.

Having made these findings, our only task now is to discuss the Court's basis for admitting the remaining documentary exhibits which are not self-authenticating.

■ The Debtor objects to the "remaining" exhibits on the basis that they are hearsay, and if those exhibits had been offered for the truth of their contents, she would be correct, inasmuch as they are out of court statements. FED. R. EVID. 801. The fact is, however, that they were not offered for the truth of their contents, but rather for the inference created by virtue

of their discovery in the direct or constructive possession of the Debtor. Evidence offered for this purpose is admissible as non-hearsay. *See United States v. Singer,* 687 F.2d 1135, 1147 (8th Cir.1982); *United States v. Saint Prix,* 672 F.2d 1077, 1083–84 (2nd Cir.1982); *United States v. Lieberman,* 637 F.2d 95, 101 (2nd Cir.1980).

As to the kind of inferences that can be drawn from documents without using them for the truth of their contents, the *Prix* case is particularly instructive. *United States v. Saint Prix,* 672 F.2d 1077, 1083–84 (2nd Cir.1982). In *Prix,* the Court admitted as non-hearsay car sales receipts with the defendant's name on them. Explaining the basis for the court's admission of the sales slips and the inferences drawn therefrom, the court stated:

> [T]he sales slips were not admitted to prove that Hutchison [the defendant] bought the vans. They were admitted to prove that someone using Hutchison's name bought the vans, from which the jury could infer that the person using Hutchison's name was Hutchison himself. Admission for this purpose is permissible so long as other evidence connected Hutchison with the person using his name. Such evidence is in the record. Hutchison lived at 302 London Road, the address at which Bennett [a codefendant] registered the BILL MATHER [a boat used for trafficking marijuana] and at which Bennett lived. Bennett provided the cash for the vans bought at [the car dealership].

*Id.* at 1083. *See also, Singer,* 687 F.2d at 1147.[9]

■ The reasoning applied in Hutchinson is directly applicable to the evidence at issue here—the exhibits offered by the

Trustee all demonstrate, in some manner, Moss's connection with the various property (or entity in possession thereof) that the Trustee is seeking to have declared property of and brought back into the bankruptcy estate. And, the exhibits do this not by individually standing for the truth of assertion represented therein, but by the cumulative implication of the exhibits being found together and in Moss's possession. For example, Exhibit 15A shows a deed of trust in the Oxnard house from Marilyn Margaret Bryant to "Katwalk Pacific Mfg. Division, N.S. Corp." When Moss was arrested she had in her possession business cards showing Marilyn Bryant as owner of "National Supply Corp., Katwalk Pacific Mfg. Div." (Exh. 284). Examined individually and taken strictly for the truth of the statements asserted therein, these exhibits might very well be hearsay. However, when examined in light of the fact that they were found in Moss's possession and in conjunction with the (self-authenticating) Arizona and Nevada drivers licenses showing Moss's picture and issued in the name of Marilyn Margaret Bryant and Margaret Whitman Bryant, those exhibits sufficiently support the *inference* that Moss conveyed the Oxnard house to Katwalk which was also owned by her—a fact which is relevant to the issues presented here, *i.e.,* that Moss was attempting to transfer property with the intent to hinder or delay her creditors.

Therefore, for the reasons stated above, the Court overrules the Debtor's hearsay objections on the basis that the documents are admissible non-hearsay. We further note, however, that to the extent that the inferential value of an exhibit is insufficient to remove it from the penumbra of hear-

---

9. In *Singer,* in order to establish whether a defendant lived at a certain address, the court admitted into evidence an envelope found at that address on which was written the defendant's name and address. The court reasoned:

> If this letter were submitted to assert the implied truth of its written contents—that Carlos Almaden [the defendant] lived at 600

Wilshire—it would be hearsay and inadmissible. It is, however, admissible nonhearsay because its purpose is to imply from the landlord's behavior—his mailing a letter to "Carlos Almaden," 600 Wilshire—that "Almaden" lived there. In addition, it is important that the letter was found in the residence at 600 Wilshire.

*Id.*

say, the Court believes that the residual exception to the hearsay rule supports its admission into evidence. FED. R. EVID. 807.

▮▮▮ Rule 807 provides in relevant part:

A statement not specifically covered by Rule 803 or 804 but having equivalent circumstantial guarantees of trustworthiness, is not excluded by the hearsay rule, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence. However, a statement may not be admitted under this exception unless the proponent of it makes known to the adverse party sufficiently in advance of the trial or hearing to provide the adverse party with a fair opportunity to prepare to meet it, the proponent's intention to offer the statement and the particulars of it, including the name and address of the declarant.

FED. R. EVID. 807. The requirements of Rule 807 are four-fold [10] and the evidence in question meets all of those requirements.

1. The evidence must be of "equivalent trustworthiness."

"In assessing the qualitative degree of trustworthiness of a particular statement, courts should inquire into the reliability of and necessity for the statement." *United States v. Earles*, 113 F.3d 796, 799 (8th Cir.1997) (quoting *United States v. Carlson*, 547 F.2d 1346, 1354 (8th Cir.1976)). The reliability of the evidence in this case is established by the fact that the evidence was (a) documents; (b) which were found in Moss's possession (in her storage units, cars, and on her person) and perhaps most importantly, (c) were made at a time and under circumstances that suggest a greater degree of reliability than Moss's subsequent in-court statements and conduct regarding her financial affairs.

2. The evidence must be necessary, in that it must be more probative on the point for which it is offered than any other evidence the proponent may reasonably procure.[11]

We find that the allegedly hearsay documents produced by the Trustee were necessary under the terms of Rule 807 because they speak to facts and events which, as we determined in the Memorandum Opinion and Order entered contemporaneously herewith in Adversary Proceeding No. 00–4058, Moss has been trying to conceal since the inception of this bankruptcy case; for most of the transactions at issue, those documents are the *only* evidence available.

3. The evidence establishes a material fact.

This requirement is met for each exhibit inasmuch as the documents show, *inter alia*, Moss's ownership, dominion and transfer of specific property, Moss's use of various aliases, and Moss's control over various corporations (which as we discuss below were set up to perpetrate a fraud). These facts are material and central to the issues presented in the instant Adversary Proceeding.

4. The proponent of the evidence must provide the adverse party sufficient notice that the proponent intends to offer said evidence.

The Court finds that the adverse party, Moss, had more than adequate notice of

---

10. *See* Wright & Miller, FEDERAL PRACTICE AND PROCEDURE § 7095 (2000). The statute actually states five requirements, the fifth being the requirement that the general purposes of the rules and the interest of justice be best served by admission of the statement into evidence. However, that element "is largely a restatement of Rule 102 and as such is of little practical importance in determining admissibility." *Id.*

11. *See* Wright & Miller, FEDERAL PRACTICE AND PROCEDURE § 7095 (2000).

the Trustee's intent to offer the evidence she labeled as hearsay. First, Moss knew about the majority of the evidence offered because most of it had already been offered at previous hearings, namely the hearing held by the Court on May 15, 2000, on the Trustee' Motion to Amend the Petition Nunc Pro Tunc to Include All Names Used by Debtor Within Six Years Before the Filing of the Petition Herein. (Case No. 98–43272, Doc. No. 59) Moss was also given specific notice of the Trustee's intent to offer the evidence in question on November 14, 2000, when the Trustee provided Moss and the Court with his Amended Exhibit Index. Moss was then given an additional opportunity to prepare any objections she might have to the Trustee's exhibits when the Court gave her time between the first and second day of trial on the evening of November 15, 2000, to prepare a written list of her specific objections. If Moss had any objections to the insufficiency of notice, she should have raised them at that time; however, the record reflects that she was satisfied with the opportunity given to her to submit written objections to the Trustee's evidence on November 16, 2000, and she did, in fact, submit a multi-page list of specific objections to the Trustee's exhibits.

Thus, based on the above analysis, the evidence offered by the trustee to which the Debtor objected as hearsay is admissible for its inferential value on the basis that it was non-hearsay or, to the extent that it may have been offered to prove the truth of the matter asserted, it is admissible under Federal Rule of Evidence 807, the residual exception to the hearsay rule.

Therefore, for the reasons stated above, the Debtor's evidentiary objections will be overruled and all of the exhibits offered by the Trustee and not previously excluded will be admitted.

## II

Although the foregoing evidentiary ruling is necessary for our findings of fact and conclusions of law in our analysis of Counts I, II, III, V and VIII of the Trustee's Complaint, the Court finds that based on the statements made by Moss at trial and in her pleadings, most notably in her amended Bankruptcy Schedules, filed on June 28, 2000, the Trustee is entitled to judgment as a matter of law on Counts IV, VI, and VII—the Counts that request declaratory judgments that the property listed therein is property of the estate.

Moss stated in her Amended Bankruptcy Schedules and testified at trial that all of the property the Trustee now seeks is not property of the estate because, she purports, it is owned by the M. Margaret Whitman Bryant Charitable Trust and is exempt pursuant to (depending on the item) either California Code of Civil Procedure § 704.140 and 28 U.S.C. § 1738, or certain Arizona exemption laws (ARIZ. REV. STAT. 33–1101, *et seq.*).

 Aside from being inherently flawed and legally inconsistent—(1) if the Trust, not Moss, owns the property, then she cannot claim it as exempt on her bankruptcy schedules because debtors are only allowed to claim an exemption in property in which they have an interest;[12] and (2) even if Moss were entitled to claim an exemption under a state law other than Missouri (which she is not), under no circumstances would she be entitled to claim exemptions under the laws of two different states—Moss's argument fails, as a matter of law, because we have already determined (in our Memorandum Opinion and Order entered contemporaneously herewith in the main bankruptcy case) that Moss is not entitled to claim the exemptions listed on Schedule C. And more importantly, Moss's argument fails because she has failed to establish the validity of the M. Margaret Whitman Bryant Charitable Trust ("Trust").

12. *In re Thorpe,* 251 B.R. 723, 724 (Bankr. W.D.Mo.2000).

The party asserting the existence of a trust has the burden of proving the facts that create the trust. *Prevost v. Gratz*, 19 U.S. 481, 5 L.Ed. 311, 6 Wheat. 481 (1821); *In re Shank*, 240 B.R. 216 (Bankr.D.Md.1999); *Foster v. Friede*, 37 Mo. 36 (Mo.1865). The only documentary evidence introduced to support the existence of a trust was an original trust document entitled "Declaration of Trust of Anne Margaret Whitman Bryant," dated April 18, 1997, and a copy of another trust document which was identical to the original in all respects but the notary's signature,[13] the date, which was noted as May 18, 1997, and the name of the Trust, which was indicated as the M. Margaret Whitman Bryant Trust. (Exh. 108) Moss could not explain the reason for or difference between these two "trusts," and she claims that the M. Margaret Whitman Bryant Trust was actually set up in 1996, but offered no evidence to support that claim. Moss also contends that the trust document was incomplete, but since she bears the burden of establishing the trust, she also has the burden of providing the supposedly missing parts. Therefore, in the absence of any other reliable evidence pertaining to the Trust, the Court will determine the validity of the Trust based on the April 18, 1997, trust document.

The validity of a trust is determined by reference to the law of the state "selected by the settlor" in the instrument creating the purported trust. MO. REV. STAT. § 456.234. In this case, the applicable law would be Arizona state law, inasmuch as that was where the instrument was purportedly signed and notarized.[14] In order to establish the existence of a valid trust under Arizona law, Moss must show that (1) the settlor was competent; (2) there is a trustee; and that (3) the trust instrument indicates: (a) a clear and unequivocal intent to create a trust; (b) an ascertainable trust res; and (c) sufficiently certain beneficiaries. *Doss v. Kalas*, 94 Ariz. 247, 251, 383 P.2d 169, 172 (Ariz. 1963).

Applying the above standard to the Anne Margaret Whitman Bryant Charitable Trust, the Trust fails because Moss has failed to show that the Trust was settled with any ascertainable trust res or that it has sufficiently certain beneficiaries: (1) The Trust indicates that the Trust was settled with certain property "described in the attached Schedule 'A,'" but that schedule was not attached to the trust document found in Moss's possession and Moss has failed to provide it. (2) The text of the Trust fails to identify any beneficiaries. Notwithstanding, Moss contends that she is the beneficiary of the trust and that the Trust property is to be used for her benefit during her lifetime, and that upon her death the remaining trust assets are to care for abused animals. Moss, however, has offered no evidence, documentary or otherwise, to support this contention.[15]

---

13. The Court does not purport to be an expert in handwriting analysis, but an examination of the two signatures strongly suggests that the May 18, 1997, trust document was signed by someone other than the signer of the April 18, 1997, document. Since both documents bear the same notary stamp, the only conclusion is that one of the notary signatures has been forged.

14. The choice of law here is largely irrelevant since the ultimate result, *i.e.*, the failure of the trust, would be the same if analyzed under the laws of Missouri, Nevada or California—all of the states with which Moss has asserted a connection at some point in time in this case. *See Webb v. St. Louis County National Bank*, 551 S.W.2d 869 (Mo.Ct.App.1977)(listing elements of valid trust under Missouri law); *Teamsters Local 533 v. Schultz (In re Schultz)*, 46 B.R. 880, 884 (Bankr.D.Nev.1985) (setting forth requirements of trust under Nevada law); *Osswald v. Anderson*, 49 Cal.App.4th 812, 57 Cal.Rptr.2d 23, 25 (1996) (listing elements of valid trust under California law).

15. Even if we were to assume, for a moment, that the trust didn't fail, *i.e.*, that the res of the trust was ascertainable (*e.g.*, consisted of all of the items identified in the Debtor's schedules as trust property) and that Moss was the beneficiary of the Trust, all of the Trust property would be subject to turnover pursuant to the Trustee's (in bankruptcy) strong arm pow-

When a trust fails, as it has here, the title of any property purportedly transferred to the trust is deemed held for the transferor. *See In re Haworth,* 253 B.R. 478, 2000 WL 1481378, *2 (Bankr.D.Wyo. 2000) (citing Restatement (Third) of the Law of Trusts, § 8) (Tentative Draft 1 1996). Therefore, as transferor, the property Moss contends is held by the Trust will be deemed held for her, and as such will constitute property of the bankruptcy estate. 11 U.S.C. § 521. This holds true for the property to which Moss personally held title prior to the purported transfers into the Trust, and for any property that Moss might claim came from one of the various corporations she set up to "preserve" her assets, most notably, Transpacific Conservancy Inc. ("TCI"). The property previously titled in the name of TCI will be considered property of the bankruptcy estate because, based on Moss's admissions at trial and in her pleadings (and equally supported by the evidence adduced at trial), either (1) TCI's corporate charter had been revoked and therefore, under Nevada law, TCI's assets would be distributed to Moss as the sole shareholder, NEV. REV. STAT. § 78.175, or (2) TCI was Moss's alter ego and as such had no separate identity.

■■■■ The separate identity of a corporation will not be recognized when the corporation has no appreciable existence apart from its shareholder and the form is used as a subterfuge to defraud a creditor. For purposes of determining whether TCI was Moss's alter-ego, we look to Nevada law, since TCI was a Nevada Corporation,

*Polaris Indus. Corp. v. Kaplan,* 103 Nev. 598, 747 P.2d 884, 886 (1987), although the analysis would be the same whether proceeding under Missouri, Arizona or California law. *See Schlingman v. Reed,* 750 S.W.2d 501, 504 (Mo.Ct.App.1988); *Standage v. Standage,* 147 Ariz. 473, 475, 711 P.2d 612, 614 (1985); *Sonora Diamond Corp. v. Superior Court of Tuolumne County,* 83 Cal.App.4th 523, 537, 99 Cal. Rptr.2d 824, 835 (Cal.Ct.App.2000).

■■■■ Moss's own testimony alone provides sufficient proof of the fact that TCI (as well as the other corporations set up by Moss) was her alter ego. At trial, Moss testified that TCI was incorporated in 1994 for the purpose of "protecting" and "preserving" her assets and to conduct her personal business, *e.g.,* investing and tax planning.[16] Taken at face value, these statements have the aura of legitimacy; Moss came into a great deal of money as a result of her personal injury settlement, and she, like anyone else, was entitled to take measures to invest that money wisely. However, when viewed in light of the facts that there was an outstanding judgment against Moss for over $700,000.00, and that it had already been determined that the proceeds of her settlement were not legally exempt from execution by creditors,[17] Moss's claim that TCI was incorporated and used to "protect" and "preserve" her assets is tantamount to an admission that she intended to use TCI as a vehicle to thwart the collection efforts of judgment creditors Burton & Norris and Gronemeier & Barker. In other words, couching her

---

ers of 11 U.S.C. § 544 because the Trust would be a self-settled trust with the Debtor as the only beneficiary. (A fact that would be true under Missouri, Arizona, California or Nevada law. *See* MO. REV. STAT. § 456.080(3); AZ. REV. STAT. § 14–7706(B); Nev.Rev.Stat. § 166.120(3); CAL. PROB. CODE § 15304(a)). The fact that Moss labeled the Trust "Charitable" is of no legal consequence whatsoever.

**16.** In her § 343 examination in December 1993, Moss also testified that she set up Solutions, Inc., and Santa Barbara Mortgage

Company to "support me [Moss] for the rest of my life." (Ex. 35. p. 60.)

**17.** The issue of whether Moss was entitled to claim the proceeds of her personal injury settlement as exempt under California Code of Civil Procedure Section 704.140 was conclusively decided on May 10, 1996, and this Court intends to give full faith and credit to that judgment. *See* this Court's Memorandum Opinion and Order entered contemporaneously herewith in the main bankruptcy case, Case No. 98–43272.

conduct in terms of asset protection and preservation does not change the reality of what she did nor does it change the impact of those statements as an admission of her intent; Moss wanted to and did in fact (attempt to) use TCI as a vehicle to put her assets out of the reach of her individual (versus corporate) judgment creditors. Moss further admitted, and the evidence adduced at trial supports, that she treated the assets that had been "transferred"[18] to TCI as her own personal assets.

Therefore, the Court may conclude based on Moss's admissions and without reference to the Trustee's evidence that there is sufficient cause under Nevada law[19] to disregard TCI's corporate form and treat TCI as Moss's alter ego.[20] Accordingly, all assets that were transferred to the Trust which originated from TCI will also be considered to have re-vested in Moss personally and thus be part of the bankruptcy estate (assuming that those assets had not already been disbursed to Moss as a result of the revocation of TCI's corporate status).

The Court's determinations that the M. Margaret Whitman Bryant Trust fails, and that TCI was Moss's alter ego have another implication, which, to some degree, obviate the need for the Trustee's fraudulent transfer claims in Counts I, II, III and V—If the Trust is not valid and TCI has no existence separate from Moss, there are no actual transfers to avoid; the property at issue in Counts I, II, III and IV was never owned by anyone other than Moss herself, and therefore is already part of the bankruptcy estate.

### III

Notwithstanding the fact that the Court's determination that the property at

issue never left Moss's ownership obviates the need to avoid the transfers of that property to the Trust or TCI, to the extent that any of the transfers could be construed to be valid, the Court finds ample support in the evidence to establish that those transfers were indeed fraudulent and may be avoided pursuant to 11 U.S.C. 544(b)(1), which incorporates state fraudulent conveyance law into bankruptcy proceedings. *See Blackwell v. Lurie (In re Popkin & Stern)*, 223 F.3d 764, 769, n. 11 (8th Cir.2000). In this case, either Missouri or Arizona law would apply to the transfers in question because some of the property is located in Missouri and the alleged transfers took place in Arizona. Both states, however, have adopted identical portions of the Uniform Fraudulent Transfer Act ("UFTA"), so the Court need only make one analysis. *See* AZ. REV. STAT. § 44–1004 or MO. REV. STAT. § 428.024.

Under Missouri and Arizona law, a transfer is fraudulent and may be avoided if it was made "with actual intent to hinder, delay, or defraud any creditor." MO. REV. STAT. § 428.024.1(1); AZ. REV. STAT. § 44–1004(A)(1). Because direct proof of actual intent is usually unavailable, the UFTA provides a list of factors, often called the "badges of fraud," which may be considered in determining whether the debtor had the requisite fraudulent intent. In the present case, though, there is no need to resort to those factors since we have direct evidence of the Debtor's intent—as we discussed above, the Debtor's admission that she transferred her property, including the Toyota Tacoma (Count I), the Mercedes (Count II), the Winnebago (Count III) and all of the property listed in the her

---

**18.** In reality, there were few, if any, official transfers of assets from Moss or other entity to TCI; usually, Moss just changed the name on an account or title to that of TCI to effect the "transfer."

**19.** See *Polaris Indus. Corp. v. Kaplan*, 747 P.2d at 886.

**20.** This finding is equally applicable to the other corporations set up by Moss (Solutions, Inc., Santa Barbara Mortgage, Inc., and National Supply Corporation) for presumably the same purpose, *i.e.*, to preserve and protect her personal injury settlement.

Amended Schedules (Count V), to the Trust in order to protect and preserve it is equivalent to a declaration that she transferred those assets with the actual intent to hinder, delay or defraud her creditors. Nonetheless, applying the statutory factors to Moss's transfers, the implications are equally damning. In fact, every factor but one applies to Moss's transfer of her property to the Trust. The statutory factors and apposite facts from this case are:

(1) The transfer or obligation was to an insider—The Trust was an insider; Moss herself was the settlor, the trustee of the trust, and the sole (though unnamed) beneficiary.

(2) The debtor retained possession or control of the property transferred after the transfer—Moss retained possession and complete control of the property transferred; the only change (to the extent any change at all took place) was a change in title.

(3) The transfer or obligation was disclosed or concealed—The Debtor concealed her interest in (and the very existence of) the Trust until the § 341 meeting of creditors on July 5–6, 2000, and the filing of her Amended Bankruptcy Schedules on June 28, 2000.

(4) Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit—At the time of the transfers, the Debtor had been sued, a judgment had been obtained against her, and the judgment creditors were actively pursuing collection of that judgment.

(5) The transfer was of substantially all the debtor's assets—According to Moss's schedules and her statements in Court, the transfer was *all* of her assets, except for a few items of personal property and a small amount of cash.

(6) The debtor absconded—Based on the evidence, it appears as though the Debtor has been "absconding" ever

since she received the proceeds of her personal injury settlement. Specifically, the Court finds that Moss's flight from California and subsequent flight from Nevada and Arizona constitute absconding.

(7) The debtor removed or concealed assets—The evidence and Court files show that the Debtor concealed the transferred assets until they were discovered by the Trustee. Only then did she begin to acknowledge the existence of and her interest in the property of which the Trustee now seeks turnover.[21]

(8) The value of the consideration received by the debtor was not reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred—In this case, the evidence adduced at trial indicates that no value was given in consideration of the assets supposedly transferred to the Trust. Further, Moss has never asserted that any value was ever given as consideration.

(9) The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred—Based on Moss's testimony and her statements on her Amended Schedules, Moss transferred *all* of her property into the Trust and as a result is, for all practical purposes, insolvent; she has a few items of personal property and currently appears to be dependent on her family for support.

(10) The transfer occurred shortly before or shortly after a substantial debt was incurred—Although the transfer of assets to the trust did not occur shortly before or after the $600,000.00–plus judgment was entered against her, other transfers, such as transfer of the deed of trust on the Oxnard house to Solutions Inc., did occur shortly before or after the judgment against her was entered,

**21.** The Court notes that it is not entirely convinced that some concealment does not con-

tinue today.

and the transfers of assets to the Trust and to TCI were just the latest episodes in what has been a seven or eight-year course of evasive conduct.

(11) The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor—This is the *only* factor that is inapplicable to the instant case.

The above application of statutory factors leaves no doubt that the Debtor transferred her assets to the Trust and to TCI (as well as the other alter ego corporations used from 1992 to 1997), with the actual intent to hinder, delay, and defraud her creditors. Therefore, the Court finds that, pursuant to 11 U.S.C. § 544(b)(1), and by implication Mo.Rev.Stat. § 428.024.1(1) or Az.Rev.Stat. § 44–1004(A)(1), the transfers of the Debtor's property identified in Counts I, II, III and IV, will be avoided.

## IV

▮ In Count VII of his Complaint, the Trustee seeks to enjoin the Debtor from taking certain conduct that would deplete the Debtor's bankruptcy estate or make it more difficult to ascertain the nature and extent of bankruptcy estate property. In essence, the Trustee is seeking to enjoin the Debtor from doing things that are already prohibited by the Bankruptcy Code. 11 U.S.C. §§ 521, 541. However, in light of the Debtor's history of unauthorized and/or fraudulent transfers during this bankruptcy proceeding as well as during the California bankruptcy proceedings, and of establishing corporations, trusts, or other artificial entities for the purpose of concealing her assets from the bankruptcy estate and judgment creditors, the Court believes it is appropriate to

grant the injunctive relief sought by the Trustee in Count VII, and the Court has the authority to enter such relief pursuant to 11 U.S.C. § 105(a).[22] Therefore, the Court will grant the relief requested in Count VII of the Trustee's Complaint.

Therefore, for the reasons cited herein, it is

**ORDERED** that the relief requested in Counts I–VII of the Trustee's Complaint to set aside fraudulent transfers; for turnover of property of the estate; for declaratory judgment and for a permanent injunction prohibiting further transfers of property by defendants, filed on July 31, 2000, be and is hereby granted.

**SO ORDERED**.

▮

In re Marilyn M. MOSS, a/k/a Marilyn Margaret Bryant, a/k/a Marilyn Moss Bryant, a/k/a M. Margaret Bryant, a/k/a Marilyn Wall Bryant, a/k/a Marilyn Whitman Bryant, a/k/a Margaret ("Peggy") Whitman, a/k/a Margaret ("Peggy") Whitman Bryant, a/k/a Margaret Bryant, a/k/a Marge Bryant, a/k/a Mari Bryant, a/k/a Mary Bryant, a/k/a Anne Bryant, a/k/a Ann Whitman, a/k/a P.M. Whitman, a/k/a Ann Margaret Whitman, a/k/a Anne Margaret Whitman, a/k/a Anne M. Whitman Bryant, a/k/a Anne Margaret Whitman Bryant, a/k/a Anne Margaret Whitman Bryant Trust, a/k/a M. Whitman Bryant, a/k/a M. Margaret

---

**22.** Section 105(a) provides that "the court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." In this instance, the Court uses § 105 to carry out the provisions of § 521 and § 541. 11 U.S.C. § 105(a). *See also, Management Tech. Corp. v. Pardo (In re Management Tech. Corp.)* 56 B.R. 337, 338 (Bankr.D.N.J.1985) ("Indeed, § 105(a) has been properly utilized to issue injunctions and other writs necessary to protect the estate from interference, and to ensure its orderly administration.") (citing *Diners Club, Inc. v. Bumb*, 421 F.2d 396, 398 (9th Cir.1970)) (decided under § 105(a)'s predecessor under the former Bankruptcy Act, § 2(a)(15)).